Receipt Number

5 6 0 7 9 1

**51**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

**INTERNATIONAL TECHNOLOGIES
CONSULTANTS, INC.,**

        *Plaintiff,*

vs.

**LESLIE T. STEWART and STEWART
ENGINEERS & ASSOCIATES, INC.,**

        *Defendants.*

Case: 2:07-cv-13391
Assigned To: Cook, Julian Abele
Referral Judge: Scheer, Donald A
Filed: 08-14-2007 At 02:42 PM
CMP INTL TECH CONSULTANTS, INC V. S
TEWART, ET AL (TAM)

/

---

ROBERT C.J. TUTTLE (P 25222)
ROBERT C. BRANDENBURG (P 28660)
**BROOKS KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075-1238
Tel:    (248) 358-4400
Fax:   (248) 358-3351

    *Attorneys for Plaintiff*

/

# VERIFIED COMPLAINT



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

# I.  THE PARTIES

1.      Plaintiff, International Technologies Consultants, Inc. ("ITC"), is a Michigan corporation, having its registered office at 4555 Kingswood Drive, Brighton, Michigan 48116.

2.      Defendant, Leslie T. Stewart ("Stewart"), a citizen of Michigan is the President, Director and sole shareholder of Stewart Engineers & Associates, Inc. ("Stewart Engineers").

3.      Defendant, Stewart Engineers, is a Michigan corporation, having its registered office at 23722 East River Road, Grosse Ile, Michigan 48138.

4.      Defendant Stewart Engineers also has a place of business at 27560 Cahill Road, Flat Rock, Michigan 48134, and has a URL of www.stewartengineers.com.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax  (248) 358-3351

www.brookskushman.com

-1-

## II. **JURISDICTION**

5.     The federal claim pleaded herein arises under the Federal Trademark Act, 15 U.S.C. § 1051 *et seq.*

6.     Subject matter jurisdiction for the federal claim pleaded herein is conferred on the Court by 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a).

7.     The state law claims pleaded herein arise under the laws of the State of Michigan.

8.     Subject matter jurisdiction for the state law unfair competition claim is conferred upon the Court by 28 U.S.C. § 1338(b), as a claim of unfair competition joined with a substantial and related claim under the trademark laws.

9.     Subject matter jurisdiction for all state law claims pleaded herein is conferred upon the Court under 28 U.S.C. § 1367(a), because such other state law claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

## III.  FACTUAL BACKGROUND

### A.    Float Glass And The Float Process

10.    The term "float glass" refers to flat glass manufactured through the "float process."  In this process, raw materials, such as silica sand, limestone and dolomite, are melted at extremely high temperatures in gas- or oil-fired furnaces.  The molten glass then leaves the furnace and "floats" on a flow of liquid tin where it is formed and drawn out in a continuous ribbon.  After leaving the tin bath, it is drawn through an annealing oven where its temperature is gradually reduced.  It is then inspected, cut to size, and packed for shipping.  Float glass has considerable cost and quality advantages over flat glass manufactured through alternative processes (plate glass or sheet glass).

11.    Because of the high shipping costs for glass, there is a demand throughout the world for float glass plants.  However, building a float glass plant is capital expensive, costing from $50 million to $ 150 plus million per plant.

### B.    The Business Of Plaintiff ITC

12.    ITC's business is related to consulting and overseeing the construction of float glass plants throughout the world.

13.    ITC is presently involved in consulting and overseeing the construction of a float glass plant in Yanbu, Kingdom of Saudi Arabia, for Arabian United Float Glass Company ("AUFGC").  A "Press Release," dated 19 October 2006, informing of ITC's participation in the construction of the AUFGC float glass plant is at Exhibit A.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-3-

**C.      The Business Of Defendant Stewart Engineers**

14.      Defendant Stewart Engineers consults in the design and fabrication of glass making systems.

15.      Defendant Stewart Engineers competes with plaintiff ITC.

16.      Defendant Stewart Engineers was part of a failed bid for providing consulting services corresponding to those of ITC for the float glass plant being built by AUFGC in Yanbu, Saudi Arabia.

**D.      Plaintiff ITC's Prior Dealings
         With Defendant Stewart Engineers**

17.      On March 7, 1990, plaintiff ITC engaged defendant Stewart Engineers for float bath design services for a float line tin bath plant to be built in Europe, known as the "Euroglas Project." A true and correct copy of the engagement agreement is at Exhibit B.

18.      On information and belief, Stewart Engineers had not designed a float bath prior to its engagement by ITC.

19.      In paragraph 2.3.1, Stewart Engineers (referred to as "Engineer" in the agreement) covenanted to use only public domain information, namely:

> 2.3.1   The Engineer engages himself not to violate any rights (patents and royalties, etc.) of third parties in fulfilling this agreement and to use only public domain information.
>
> In the case of suits or claims for infringement of any patent rights or royalties the Engineer shall be obliged to defend himself and the owner or his successor or assigns and save the owner or his successor or assigns harmless from loss on account thereof. This obligation shall survive termination of the Engineer's employ with the owner.
>
> Should the owner insist on a particular design, process or product specified by the Owner, although the Engineer has pointed out to the Owner that the use of this particular design, process or product would violate a patent or royalty, then the



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-4-

Engineer shall be released from the liability for the corresponding patent infringement.

20.    In paragraph 8.2 of the engagement agreement, Stewart Engineers warranted and guaranteed that title to all work performed by Stewart Engineers would pass to ITC (referred to as "Owner" in the agreement), namely:

8.2    The Engineer warrants and guarantees that title to all work (including sketches, drawings, and computer discs) covered by an Application for Payment will pass to the Owner upon receipt of such payment by the Engineer free and clear of all liens, claims, security interests or encumbrances.

21.    Article 12 of the engagement agreement is headed "INVENTION AGREEMENT," and vests in ITC all inventions made by Stewart Engineers in the course of its performance under the engagement agreement, namely:

INVENTION AGREEMENT

12.1    For good consideration, and in consideration of the Engineer being employed by the Owner; the Engineer hereby agrees, acknowledges and represents:

12.1.1 The Engineer, during the course of this Project, shall promptly disclose in writing to the Owner all inventions, discoveries, improvements and innovations which:

a)    Result from any work performed on behalf of the Owner, or pursuant to a suggested project by the Owner, or

b)    Relate in any manner to the existing or contemplated business of the Owner, or

c)    Result from the use of the Owner's time, material, employees or facilities.

12.1.2 The Engineer hereby assigns to the Owner, it's successors and assigns, all right, title and interest to said inventions.

12.1.3 The Engineer shall, at the Owner's request, execute specific assignments to any such invention and execute, acknowledge, and deliver any additional documents required to obtain letters patent in any jurisdiction and shall, at the



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-5-

> Owner's request and expense, assist in the defense and prosecution of said letters patent as may be required by the Owner. This provision shall survive termination of the Engineer's employ with the Owner.

22.    Plaintiff ITC later engaged defendant Stewart Engineers for like engineering services for a float glass manufacturing plant to be built for P.T. Muliaglass, an Indonesian corporation, in Indonesia (the "Indonesia Project"). A true and correct copy of the Agreement, dated August 22, 1990 between ITC and Stewart Engineers is at Exhibit C.

23.    Article 6 of the Agreement for the Indonesia Project recorded the understanding of the parties that all intellectual property developed by Stewart Engineers in the course of performing its services pursuant to the Agreement was to be the property of ITC, namely:

### Article 6.    INTELLECTUAL PROPERTY

> The parties hereby agree that any intellectual property in the form of new designs, processes or equipment that may be developed by Stewart in the course of performing its services pursuant to this Agreement shall become the property of ITC. In this regard, Stewart agrees to execute any and all documentation necessary to reflect such ownership.

24.    During Stewart's and Stewart Engineers' work for ITC they acknowledged the copyright in their drawings belonged to ITC. Attached as Exhibit D are true and correct copies of blueprints created by Stewart and Stewart Engineers showing the copyright in ITC.

25.    Despite instructions to base its work on publicly available information, Stewart and Stewart Engineering was accused by Guardian Industries Corporation of taking its trade secrets. This resulted in a lawsuit against Stewart, Stewart Engineers, Dean Wiley and ITC, in Wayne County Circuit Court, entitled Guardian Industries Corp. V. Stewart Engineers & Associates, Inc., et al., Case No. 89-928108-CZ, which was eventually settled.



**Brooks Kushman** P.C.
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-6-

26. On July 23, 1991, defendant Leslie Stewart was deposed in the litigation brought by Guardian, and confirmed by sworn testimony that the design created for the Euroglas Project and the Indonesia Project belonged to ITC. The relevant excerpt from pages 373-74 of the transcript of the Stewart deposition of that date is reproduced as follows:

> Q. The design that you created for Indonesia and Euroglass belongs to ITC; is that right?
>
> A. They purchased the design, yes.
>
> Q. So you are not free to sell that design to somebody else, true?
>
> A. That's correct.

### E. Defendants' Actionable Conduct

27. On April 4, 2007, defendants Leslie Stewart and Stewart Engineers issued a letter to AUFGC, a/k/a Arabian United Glass. A true and correct copy of the April 4, 2007 letter is at Exhibit E.

28. On information and belief, defendants Leslie Stewart and Stewart Engineers have sent a similar letter to the company which is to provide financing for the AUFGC.

29. On information and belief, statements similar to those contained in the AUFGC have been provided to those responsible for a pending Russian project where again the project developers have indicated they will use a construction team including ITC to build the project, rather than one including defendant Stewart Engineers.

30. ITC did not receive a copy of the letter to AUFGC until late July, 2007.

31. On July 31, 2007, ITC wrote defendants Leslie Stewart and Stewart Engineers and demanded that they withdraw the letters and statements. Defendants refused.



Brooks Kushman P.C.
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-7-

32.     Defendants Leslie Stewart and Stewart Engineers had not expressed to ITC their alleged concerns expressed in the letter to AUFGC prior to ITC's letter of July 31, 2007 and have justified none of those concerns since..

33.     In the first paragraph of the April 4, 2007 letter, defendants Leslie Stewart and Stewart Engineers recognized the engagement of ITC as float technology providers to AUFGC for the building of a float glass manufacturing facility in Yanbu, Saudi Arabia.

34.     In the second paragraph of April 4, 2007 letter, defendants Leslie Stewart and Stewart Engineers express "grave concerns about the ownership of the float technology being used in this facility." The second paragraph of the April 4, 2007 letter is reproduced in its entirety as follows:

> We have grave concerns about the ownership of the float technology being used in this facility. Each of the facilities that use StewartFloat technology are individually licensed and are not allowed to utilize that technology for the building of additional facilities or the creation of other designs without the express permission of Stewart Engineers. In order to limit your liabilities and ensure the success of this project, you must consider the history of those involved and question the following:
>
> • Who developed and owns the float technology being used?
> • Is the design being used complete?
> • Can the technology provider demonstrate that the technology originated with them and that the copyrights and intellectual property rights of others have not been infringed?
> • Has the float technology provider successfully completed previous projects or have they left the projects prior to completion?
> • Is there a history of deception and lawsuits related to previous projects?



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358 4400
Fax (248) 358-3351

www.brookskushman.com

-8-

35.     Any assertion, express or implied, of defendants Leslie Stewart and Stewart Engineers that either has ownership of the float technology provided by ITC for use in the float glass manufacturing facility in Yanbu, Saudi Arabia, is objectively verifiably false.

36.     The April 4, 2007 letter contains false or misleading descriptions of fact, or false or misleading representations of fact, which in commercial promotion misrepresent the nature, characteristics, and other qualities of the commercial services and activities of ITC as the float glass technology provider for the float glass manufacturing facility in Yanbu, Saudi Arabia.

37.     The descriptions or representations contained in the April 4, 2007 letter were intended to deceive the Arabian United Float Glass Company on the ownership of the float technology provided by ITC for use in the float glass manufacturing facility in Yanbu, Saudi Arabia.

38.     The false and misleading descriptions or representations of fact contained in the April 4, 2007 letter are material, in the sense they are intended to influence the reader's purchasing decisions in regard to engagement of ITC as the technology provider.

39.     The false or misleading descriptions and representations of fact contained in the April 4, 2007 letter have harmed plaintiff ITC, by, *inter alia*, requiring ITC to undertake additional obligations in its performance under the contract as technology provider for the float glass manufacturing facility in Yanbu, Saudi Arabia.

40.     The false or misleading descriptions and representations of fact contained in the April 4, 2007 letter are defamatory of ITC *per se*, because ITC is accused of the commission of a crime in theft of "StewartFloat® technology."

41.     The false or misleading descriptions and representations of fact contained in the April 4, 2007 letter were intended to harm the business reputation of ITC.



Brooks Kushman P.C.
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-9-

42.     By sending the April 4, 2007 letter to AUFGC, defendants Leslie Stewart and Stewart Engineers intentionally and improperly interfered with ITC's contractual relation with AUFGC.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358.4400
Fax (248) 358-3351

www.brookskushman.com

-10-

## IV.  COUNT I
## FEDERAL UNFAIR COMPETITION
## UNDER LANHAM ACT § 43(a)

43.     Plaintiff ITC repeats and realleges the allegations of paragraphs 1 - 41 as if set forth fully herein.

44.     Defendants Leslie Stewart and Stewart Engineers have made false or misleading descriptions or representations of fact regarding ownership of the float glass technology provided by ITC, including that to AUFGC for the float glass manufacturing facility in Yanbu, Saudi Arabia.

45.     Such false or misleading descriptions or representations of fact were made in foreign commerce which may lawfully be regulated by Congress.

46.     Plaintiff ITC believes that it has been, or is likely to be, damaged by such false or misleading descriptions or representations of defendants Leslie Stewart and Stewart Engineers.

47.     Defendants Leslie Stewart and Stewart Engineers are liable to plaintiff ITC under 15 U.S.C. § 1125(a)(1)(B).



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-11-

## V.  COUNT II
## COMMON LAW UNFAIR COMPETITION

48.     Plaintiff ITC repeats and realleges the allegations of paragraphs 1 - 46 as if set forth fully herein.

49.     The conduct of defendants Leslie Stewart and Stewart Engineers constitutes unfair competition under the laws of the State of Michigan.

50.     Defendants Leslie Stewart and Stewart Engineers are liable to plaintiff ITC for common law unfair competition.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

## VI.  COUNT III
### INTENTIONAL INFERENCE WITH
### CONTRACTUAL RELATIONS

51.     Plaintiff ITC repeats and realleges the allegations of paragraphs 1 - 49 as if set forth fully herein.

52.     ITC has had since prior to April 4, 2007 a contractual relationship with AUFGC for the project to build a float glass manufacturing facility in Yanbu, Saudi Arabia.

53.     As evidenced by the first paragraph of the April 4, 2007 letter (Exhibit D), at all times relevant to this count, defendants Leslie Stewart and Stewart Engineers had knowledge of the contractual relation between ITC, as float glass technology provider, and AUFGC for the project to build a float glass manufacturing facility in Yanbu, Saudi Arabia.

54.     On information and belief, defendant Stewart Engineers was part of an unsuccessful bid to provide float glass technology for the AUFGC.

55.     The April 4, 2007 letter was, and on information and belief other communications were, intentionally sent by defendants Leslie Stewart and Stewart Engineers without justification and for the improper purpose of interfering with plaintiff ITC's contractual rights with AUFGC.

56.     The improper actions of defendants Leslie Stewart and Stewart Engineers have resulted in breach of the AUFGC contract and/or made performance of that contract more expensive or burdensome.

57.     Defendants Leslie Stewart and Stewart Engineers are liable to plaintiff ITC for intentional inference with contractual relations.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-13-

## VII.  COUNT IV
## INTENTIONAL INFERENCE WITH
## BUSINESS RELATIONSHIP OR EXPECTANCY

58.     Plaintiff ITC repeats and realleges the allegations of paragraphs 1 - 56 as if set forth fully herein.

59.     On information and belief, ITC has a business relationship or expectancy with Saratov for the project to build a float glass manufacturing facility in Russia.

60.     At all time relevant to this count, defendants Leslie Stewart and Stewart Engineers had knowledge of business relationship or expectancy with Saratov.

61.     On information and belief, defendant Stewart Engineering was part of an unsuccessful bid to provide float glass technology for Saratov.

62.     On information and belief, defendants Leslie Stewart and Stewart Engineering without justification and for the improper purpose of interfering with plaintiff ITC's business relationship or expectancy with Saratov, were involved in the making of false and improper statements regarding ITC.

63.     The improper actions of defendants Leslie Stewart and Stewart Engineers have resulted in breach business relationship and expectancy with Saratov and/or made the relationship more expensive or burdensome.

64.     Defendants Leslie Stewart and Stewart Engineers are liable to plaintiff ITC for intentional inference with business relationship or expectancy.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-14-

## VIII.  COUNT V
## TRADE LIBEL

65.     Plaintiff ITC repeats and realleges the allegations of paragraphs 1 - 63 as if set forth fully herein.

66.     The April 4, 2007 letter sent by defendants Leslie Stewart and Stewart Engineers contained false and defamatory statements concerning the plaintiff, notably, the statement, express or implied, that plaintiff ITC had misappropriated the float glass technology to be used in building the float glass manufacturing facility in Yanbu, Saudi Arabia.

67.     On information and belief, other letters and statements have been made containing the same or similar defamatory statements concerning the plaintiff, notably, the statement, express or implied, that plaintiff ITC had misappropriated the float glass technology to be used in building the float glass manufacturing facility in Saudi Arabia and one in Russia.

68.     The April 4, 2007 letter and other statements constituted an unprivileged publication of the false and defamatory statements.

69.     On information and belief, the false and defamatory statements were made with actual malice.

70.     On July 31, 2007, ITC wrote defendants Leslie Stewart and Stewart Engineers and demanded retraction of the statements.  Defendants refused.

71.     Defendants Leslie Stewart and Stewart Engineers are at fault for issuing the April 4, 2007 letter with actual malice or negligently.

72.     The false and defamatory statements are defamatory *per se*.

73.     Defendants Leslie Stewart and Stewart Engineers are liable to plaintiff ITC for trade libel.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-15-

## DEMAND FOR RELIEF

WHEREFORE, plaintiff ITC demands entry of judgment against defendants Leslie Stewart and Stewart Engineers granting relief as follows:

A.      An order determining defendants Leslie Stewart and Stewart Engineers are jointly and severally liable to plaintiff ITC for (1) federal unfair competition under Lanham Act § 43(a), (2) common law unfair competition, (3) intentional interference with contractual relations, and (4) trade libel;

B.      An award of damages in favor of plaintiff ITC, and against defendants Leslie Stewart and Stewart Engineers, adequate to compensate plaintiff ITC for the pecuniary harm caused by the actionable conduct of defendants Leslie Stewart and Stewart Engineers;

C.      An order preliminarily and permanently enjoining defendants Leslie Stewart and Stewart Engineers, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from making false or misleading descriptions or representations regarding ownership of float glass technology used by plaintiff ITC in the float glass projects on which it consults;

D.      A determination this case is "exceptional," in the sense of Lanham Act § 35(a);

E.      An award of exemplary damages to plaintiff ITC for defendants' trade libel.

E.      An award of reasonable attorney fees and costs to plaintiff ITC incurred in bringing and maintaining this action; and

F.      Such other, further and different relief as may be just and equitable on the proofs.



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel   (248) 358-4400
Fax  (248) 358-3351

www.brookskushman.com

-16-

## VERIFICATION

I, Dean Wiley, do declare under penalty of perjury that I am President of plaintiff International Technologies Consultants, Inc. and have been so since its incorporation in 1984. I have read the foregoing Verified Complaint and its exhibits and know the contents thereof. The facts set forth in the Verified Complaint are true of my personal knowledge, except as the matters stated on information and belief. As to those matters, I belief them to be true. Further, the exhibits are true and correct copies of the identified documents of which I have personal knowledge.

Date: <u>August 14, 2007</u>

Dean Wiley



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-17-

## DEMAND FOR JURY

Plaintiff ITC hereby demands trial by jury for all issues so triable.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

By _____

ROBERT C.J. TUTTLE (P25222)
ROBERT C. BRANDENBURG (P28660)
1000 Town Center
Twenty-Second Floor
Southfield, Michigan  48075-1238
Tel:  (248) 358-4400
Fax:  (248) 358-3351
Email:       rtuttle@brookskushman.com
             rbrandenburg@brookskushman.com

*Attorneys for Plaintiff*

Dated:  August 14, 2007



**Brooks Kushman P.C.**
1000 Town Center, 22nd Fl.
Southfield, MI 48075-1238
USA

Tel  (248) 358-4400
Fax (248) 358-3351

www.brookskushman.com

-18-

# PRESS RELEASE

**19 October, 2006, Yanbu, Kingdom of Saudi Arabia**

The Arabian United Float Glass Company (AUFGC) has started the construction of a 600 ton per day Float Glass plant in Yanbu, Saudi Arabia. The "State of Art" plant will utilize technology and equipment from the world's leading suppliers to the Float Glass industry. Shanghai Pony Technologies Company, LTD. (SPT) has been awarded a Technical Services contract to provide the overall plant design, project management, construction management and commissioning. SPT will also provide a "turn-key" furnace as part of the contract.



According to Mr. Mishaal Al-Orayer, Managing Director of AUFGC, the plant is designed to produce the highest quality float glass to service both the domestic Saudi Arabian and Export markets.

AUFGC is a newly formed Joint Stock Company created to build and operate the plant.

Other suppliers include well known companies such as Grenzebach, CNUD and Merkle Engineers. The tin bath will be provided by a Joint Venture between SPT and International Technologies Consultants, Inc. (ITC). Additional contracts will be announced during the upcoming GLASTEC Exhibition in Düsseldorf

The plant is schedule to start production during the first quarter of 2008.

EXHIBIT A

#89051

INTERNATIONAL TECHNOLOGIES CONSULTANTS, INC.
EUROGLAS
TIN BATH ENGINEERING





EXHIBIT B

INTERNATIONAL TECHNOLOGIES CONSULTANTS, INC.

4555 KINGSWOOD DRIVE

BRIGHTON, MICHIGAN   48116


PROJECT

**EUROGLAS**

**TIN BATH ENGINEERING**


DESIGN AGREEMENT


SUBMITTED BY:

STEWART ENGINEERS & ASSOCIATES, INC.

15100 Northline Road

Venture Center - Suite 258

Southgate, Michigan   48195


QUOTATION NO. 89051

REVISION 03


MARCH 7, 1990

89051                                    PAGE - 2

PROPRIETARY INFORMATION

        The information and/or data in this document may constitute
        proprietary information of Stewart Engineers and Associates
        Inc. and is supplied for use by it's customers. The
        disclosures contained in this document are made with the
        understanding that they are confidential and will not be used
        in any way detrimental to this company's interest.

89061                                        PAGE - 3

## DESIGN AGREEMENT BETWEEN OWNER AND ENGINEER

### TABLE OF ARTICLES

ARTICLE

1        EXTENT OF AGREEMENT

2        ENGINEER'S RESPONSIBILITIES

3        OWNER'S RESPONSIBILITIES

4        SUBCONTRACTS

5        CONTRACT TIME SCHEDULE AND ENGINEERING REVIEW

6        CONTRACT SUM

7        CHANGES IN THE WORK

8        PAYMENTS TO THE ENGINEER

9        TERMINATION OF THE AGREEMENT AND OWNER'S RIGHT TO
         PERFORM ENGINEER'S OBLIGATIONS

10       ASSIGNMENT

11       AFTER SALES SERVICE

12       INVENTION AGREEMENT

13       NON - COMPETE AGREEMENT

14       PENALTY AND LIQUIDATED DAMAGES

15       JURISDICTION

ANNEX 1

89051                                    PAGE - 4

AGREEMENT

MADE THIS            DAY OF             , 1990

BY AND BETWEEN:

THE OWNER:          International Technologies Consultants, Inc.
                    4555 Kingswood Drive
                    Brighton, Michigan  48116


AND THE ENGINEER:   Stewart Engineers & Associates, Inc.


WITH AN OFFICE AT:  Venture Center - Suite 258
                    15100 Northline Road
                    Southgate, Michigan  48195

FOR THE FOLLOWING PROJECT:   Float Line Tin Bath design services for a
plant to be built in Europe.


The Owner and the Engineer agree as follows:

## ARTICLE 1

## EXTENT OF AGREEMENT

1.1      Extent of Agreement:   This Agreement,including Annex 1,
represents the entire agreement between the Owner and the Engineer and
supersedes all prior negotiations, representations or agreements.  This
Agreement may be amended only by written instrument signed by both
Owner and Engineer.


## ARTICLE 2

## ENGINEER'S RESPONSIBILITIES

2.1      Engineer's Services

2.1.1    The Engineer shall be responsible for the Work, Scheduling,
and Pricing.  The Owner and Engineer shall develop a design phase
schedule and the Owner shall be responsible for decisions and
approvals, in a reasonable time frame, so as to maintain the approved
schedule.

2.2      Schedules

2.2.1    The Engineer will prepare and submit for the Owner's approval
an estimated progress schedule for the Work.  This schedule shall

89051                                    PAGE - 6

indicate the dates for the start and completion of the various stages of the design.  It shall be revised as required by the conditions of the Work and those conditions and events which are beyond the Engineer's control.

2.3      Royalties and Patents

2.3.1     The Engineer engages himself not to violate any rights (patents and royalties, etc.) of third parties in fulfilling this agreement and to use only public domain information.

In the case of suits or claims for infringement of any patent rights or royalties the Engineer shall be obliged to defend himself and the owner or his successor or assigns and save the owner or his successor or assigns harmless from loss on account thereof.  This obligation shall survive termination of the Engineer's employ with the owner.

Should the owner insist on a particular design, process or product specified by the Owner, although the Engineer has pointed out to the Owner that the use of this particular design, process or product would violate a patent or royalty, then the Engineer shall be released from the liability for the corresponding patent infringement.

2.4      Warranties and Completion

2.4.1     The Engineer warrants to the Owner that all Work will be of good quality and in conformance with the Contract Documents.  The Engineer agrees to correct all Work performed by him under this Agreement which proves to be defective at his own costs until the successful start up of the Float Line Tin Bath but not to exceed a period of ten years after the signing of this agreement.

2.5      Additional Services

2.5.1     The Engineer will provide the following Additional Services upon the request of the Owner.  A written agreement between the Owner and Engineer shall define the extent of such Additional Services and the amount and manner in which the Engineer will be compensated.

2.5.1.1    Services related to fabrication and purchasing of equipment and materials.

2.5.1.2    Services related to installation supervision and start up of equipment and materials.

2.5.1.3    Obtaining and training maintenance and operating personnel.

ARTICLE 3

OWNER'S RESPONSIBILITIES

3.1      The Owner shall provide full information regarding his requirements for the Project.

89081                              PAGE - 6

3.2      The Owner shall designate a representative who shall be fully
acquainted with the Project and has authority to approve changes in the
scope of the Work, render decisions and furnish information in a
reasonable time period to meet the dates set forth in the progress
schedule.

3.3      If the Owner becomes aware of any fault or defect in the Work
or nonconformance with the Contract Documents, he shall give prompt
written notice thereof to the Engineer.

3.4      The Owner shall have no contractual obligation to the
Engineer's Subcontractors and shall communicate with such
Subcontractors only through the Engineer.

### ARTICLE 4

### SUBCONTRACTS

4.1      All portions of the Work that the Engineer does not perform
with his own forces shall be performed under subcontracts.

4.2      No contractual relationship shall exist between the Owner and
any Subcontractor and the Engineer shall be responsible for the
management of the Subcontractors in the performance of their Work.

### ARTICLE 5

### CONTRACT TIME SCHEDULE
### AND
### ENGINEERING REVIEW

5.1      The Work to be performed under this Agreement shall be
commenced on or about _____ and, subject to authorized
extensions, shall be substantially completed on or about
_____.

5.2      If the Engineer is delayed at any time in the progress of the
Work by any act or neglect of the Owner or by any contractor employed
by the Owner, or by changes ordered in the Project, or any causes
beyond the Engineer's control, or a delay authorized by the Owner
pending arbitration, then the Date of Substantial Completion and the
Contract Sum shall be modified by a mutual agreement Change Order on
account of such delay.

5.3      The Owner may review the content and progress of the Work at
his discretion.

89051                                      PAGE - 7

## ARTICLE 6

## CONTRACT SUM

6.1      In consideration of the performance of the Agreement, the Owner agrees to pay to the Engineer in current funds as compensation for his services $450,000 Dollars, which sum shall be called the Contract Sum.

6.2      The Contract Sum is based upon the Contract Documents as set forth below:

Stewart Engineers & Associates, Inc. Quotation No. 89051 Revision 05, Dated March 7, 1990 and titled "Euroglas — Tin Bath Engineering".

## ARTICLE 7

## CHANGES IN THE WORK

7.1      The Owner, without invalidating this Agreement, may order Changes in the Work within the general scope of this Agreement consisting of additions, deletions or other revisions, the Contract sum and the Contract Time Schedule being adjusted accordingly. All such Changes in the Work shall be authorized by mutually agreed Change Order.

7.2      Claims for Additional Cost or Time

7.2.1    If the Engineer wishes to make a claim for an increase in the Contract Sum or an extension of the Contract Time Schedule, he shall give the Owner written notice thereof within five working days after the occurrence of the event giving rise to such claim. Any change in the Contract Sum or Contract Time Schedule resulting from such claim shall be authorized by mutually agreed Change Order.

7.3      Minor Changes in the Project

7.3.1    The Owner will have authority to order minor Changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time Schedule and not inconsistent with the intent of the now understood scope of work. Such Changes may be effected by written order and shall be binding on the Owner and Engineer.

89051                              PAGE - 8

## ARTICLE 8

### PAYMENTS TO THE ENGINEER

8.1        Payments shall be made by the Owner to the Engineer according to the following procedure:

8.1.1      On or before the first day of each month after Work has commenced, the Engineer shall submit to the Owner an Application for Payment in such detail as may be required by the Owner for the period ending on the last day of the previous month.   Each such application shall be for an amount equal to those listed in the following payment schedule and less a retainage of 10%.   Retainage will be held by the Owner and will accumulate interest at the rate for Certificates of Deposit for U.S. funds.   The retainage period shall end at the successful start up of the Float Line Tin Bath and shall not exceed ten years after the signing of this agreement.   At the conclusion of the retainage period the Owner will pay the retainage plus accumulated interest to the Engineer.

Payment Schedule:

Phase 1A

| Payment with Order | 25% | - | $ 43,876. |
|---|---|---|---|
| | Week 1 | - | 10,969. |
| | Week 2 | - | 10,969. |
| | Week 3 | - | 10,969 |
| | Week 4 | - | 10,969. |
| Invoice | | - | $ 43,876. |
| | Week 5 | - | 10,969. |
| | Week 6 | - | 10,969. |
| | Week 7 | - | 10,969. |
| | Week 8 | - | 10,969. |
| Invoice | | - | $ 43,876. |
| | Week 9 | - | 10,969 |
| | Week 10 | - | 10,969. |
| | Week 11 | - | 10,969. |
| | Week 12 | - | 10,969. |
| Invoice | | - | $ 43,876. |

89051                                    PAGE - 9

### Phase 1B

| Invoice | 25% | — | $ 29,250. |
| | | | |
| | Week 13 | — | 14,625. |
| | Week 14 | — | 14,625. |
| | Week 15 | — | 14,625. |
| | Week 16 | — | 14,625. |
| Invoice | | — | $ 58,500. |
| | | | |
| | Week 17 | — | 14,625. |
| | Week 18 | — | 14,625. |

### Phase 2

| | 25% | — | $ 28,125. |
| | | | |
| | Week 19 | — | 10,546. |
| | Week 20 | — | 10,546. |
| Invoice | | — | $ 78,467 |
| | | | |
| | Week 21 | — | 10,546. |
| | Week 22 | — | 10,546. |
| | Week 23 | — | 10,546. |
| | Week 24 | — | 10,547. |
| Invoice | | — | $ 42,184. |
| | | | |
| | Week 25 | — | 10,547. |
| | Week 26 | — | 10,547. |
| Invoice | | — | $ 21,095. |

Total            —        $405,000.        ($ 45,000. in retainage)

8.1.2    Within eight (8) days after his receipt of each monthly Application for Payment, the Owner shall pay directly to the Engineer, in U.S. Dollars, the appropriate amounts for which Application for Payment is made therein.    This payment request shall deduct the aggregate of amounts previously paid by the Owner.

8.1.3    The payment schedule, to the Engineer, may be adjusted to correspond with actual progress.    If there is a delay in the Work, payments are due when the corresponding Work according to the Contract Time Schedule is fulfilled.

8.1.4    If the Owner should fail to pay the Engineer at the time the payment of any amount becomes due, then the Engineer may, at any time thereafter, upon serving written notice that he will stop work within five (5) days after receipt of the notice by the Owner and after such five (5) day period, stop the Project until payment of the amount owing has been received.    Written notice shall be deemed to have been duly

89051                                  PAGE - 10

served if sent by certified mail to the last business address known to
the party who gives the notice.

8.2        The Engineer warrants and guarantees that title to all Work
(including sketches, drawings, and computer discs) covered by an
Application for Payment will pass to the Owner upon receipt of such
payment by the Engineer free and clear of all liens, claims, security
interests or encumbrances.

## ARTICLE 9

### TERMINATION OF THE AGREEMENT AND OWNER'S
### RIGHT TO PERFORM ENGINEER'S OBLIGATIONS

9.1        Force Majeure

9.1.1        Each party shall promptly notify the other, in writing, of
any situation or event arising from circumstances beyond the control of
the notifying party and which he could not reasonably foresee which
makes it impossible to carry out in whole or in part his obligations
under this Agreement.  Upon the occurrence of such a situation or event
the Work shall be deemed to be postponed for a period of time equal to
that caused by the Force Majeure and a reasonable period not exceeding
one (1) month to remobilize for the continuation of the Agreement.

If the Work is postponed, because of Force Majeure, for a period longer
than one (1) year then each party has the right to terminate this
Agreement with written notice.   The Engineer is entitled to recover
from the Owner payment for all work executed.

For the purposes of this Agreement, the term "Force Majeure" shall mean
circumstances beyond either party's reasonable control including acts
of any governmental body, war, insurrection, sabotage, embargo, fire,
flood, strike or other labor disturbance, interruption of or delay in
transportation, or inability to obtain materials, supplies, or power;
provided, however, that lack of credit, funds, or financing shall not
be considered a matter beyond the reasonable control of the party.
Judgements of a court or governmental body prohibiting the Engineer
from proceeding with the performance of his obligations under this
Agreement for cause of patent infringement or any circumstances within
the control of the Engineer are not regarded as Force Majeure.

9.2        Owner's  Right  to  Perform  Engineer's  Obligations  and
Termination by the Owner for Cause

9.2.1        If the Engineer fails to perform any of his obligations under
this Agreement, the Owner may, after seven days' written notice, during
which period the Engineer fails to perform such obligation, make good
such deficiencies and reduce the contract sum by the cost of making
good such deficiencies or, if he wishes, terminate this Agreement and
recover from the Engineer all loss or damages resulting from the breach
of this Agreement by the Engineer.

89051                              PAGE - 11

9.2.2      If the Owner, in the course of his design review according to
Article 6.3 of this Agreement, notices that the Work of the Engineer
doesn't fulfill the technical standard requested he is entitled to
terminate this agreement with written notice.      In the case of
termination, the Engineer is entitled to recover from the Owner payment
for all Work properly executed.

9.3        Termination by the Engineer

9.3.1      If the Owner unreasonably delays the Engineer in the
performance of the Work or fails to make payments thereon in accordance
with Article 11, or is guilty of other substantial breach of this
Agreement, then the Engineer may, upon seven days' written notice to
the Owner, terminate this Agreement and recover from the Owner payment
for all work executed.


## ARTICLE 10

### ASSIGNMENT

10.1       The Engineer shall not assign his interest in this Agreement
without the written consent of the Owner.


## ARTICLE 11

### AFTER SALES SERVICE

11.1       The Engineer's work includes clarification, to the Owner or
his agent, of engineering intent and design for a period not to exceed
the successful start up of the Float Line Tin Bath or ten years after
the signing of this agreement.


## ARTICLE 12

### INVENTION AGREEMENT

12.1       For good consideration, and in consideration of the Engineer
being employed by the Owner; the Engineer hereby agrees, acknowledges
and represents:

12.1.1     The Engineer, during the course of this Project, shall
promptly disclose in writing to the Owner all inventions, discoveries,
improvements and innovations which:

   a)   Result from any work performed on behalf of the Owner, or
   pursuant to a suggested project by the Owner, or

   b)   Relate in any manner to the existing or contemplated business
   of the Owner, or

   c)   Result from the use of the Owner's time, material, employees
   or facilities.

89051                                    PAGE - 12

12.1.2    The Engineer hereby assigns to the Owner, it's successors and assigns, all right, title and interest to said inventions.

12.1.3    The Engineer shall, at the Owner's request, execute specific assignments to any such invention and execute, acknowledge, and deliver any additional documents required to obtain letters patent in any jurisdiction and shall, at the Owner's request and expense, assist in the defense and prosecution of said letters patent as may be required by the Owner.    This provision shall survive termination of the Engineer's employ with the Owner.

## ARTICLE 13

### NON-COMPETE AGREEMENT

13.1    For good consideration, the receipt of which is hereby acknowledged, the Engineer and Owner or his successors or assigns agree not to compete with each other or their respective successors or assigns.

13.2    The term "not to compete" shall mean that the Engineer and Owner or his successors or assigns shall not directly or indirectly compete with the other's Company by serving as an agent or consultant or supplying Float Line Tin Bath Engineering or information to any firm or entity substantially engaged in a business similar or competitive to the business of the Engineer or Owner or his successors or assigns.

13.3    In the event that either the Engineer or Owner are presented with further Work or business opportunities from another company and that Work is substantially similar to or in addition to this project, the Engineer or Owner will not proceed with the Work without written mutual consent.

13.4    This agreement shall remain in effect for 10 years from the date of this Agreement and shall extend to the geographic area of Europe.

## ARTICLE 14

### PENALTY AND
### LIQUIDATED DAMAGES

14.1    The Engineer and the Owner or his successors or assigns acknowledge and agree that breach of either Article 12 or 13 of this Agreement will cause serious damage to the parties to this Agreement. The Engineer and Owner agree to pay the damaged party a Penalty of 50% of the contract sum as liquidated damages for each and every breach of Articles 12 and/or 13 of the Agreement.    Payment of the Penalty doesn't relieve the damaging party from the obligation of this Agreement.

89051                              PAGE - 13

## ARTICLE 15

### JURISDICTION

15.1      Jurisdiction for this Agreement is Amsterdam, Netherlands, and it will be interpreted under Dutch Law.

15.2      If one or more of the points of this Agreement are found to be inconsistent with Law, the other points of the Agreement will remain in effect and the parties will replace the invalidated point with another point which is consistent with the original will and intent of the Parties and is consistent with Law.


This Agreement entered into as of the day and year first written above.


ATTEST:_____      OWNER: _____

                                     BY: _____

                                     TITLE: _____


ATTEST: _Michael Ohlgas_____      CONTRACTOR: STEWART ENGINEERS &
                                                 ASSOCIATES, INC.

                                     BY:_____
                                        Leslie T. Stewart

                                     TITLE: President

89051                          PAGE - 14

## ANNEX 1

1.        SCOPE OF WORK

   1.1  TIN BATH

Stewart Engineers will provide design engineering services
for the complete construction of a "Float Line Tin Bath".
The design will be completed in metric standards .and
dimensions where ever practical.

### Phase 1

A.   The first part of this phase of the design work will
include the establishment of specific design criteria and
dimensioned sketches that we will expand on to provide
finished layout and assembly drawings, for the tin bath
proper, that will be suitable for engineering reviews.

B.   The second part of this phase will include finished
layout and assembly drawings for all other tin bath systems
and auxiliary equipment not included in 1.A

### Phase 2

This phase will include the creation of all detail drawings
for assemblies and their components and together with the
drawings completed in phase 1, will provide an engineering
package suitable for fabrication and installation purposes.

   A.1        THE FOLLOWING PRODUCT CRITERIA ARE TO BE USED:

Product  -  Soda/Lime Silica Glass
Daily Tonnage  -  550 Short Tons
Maximum Gross Ribbon Width  -  4,064 mm

   A.2        THE FOLLOWING "FLOAT TIN BATH" GENERAL DESIGN
AND FABRICATION CRITERIA SHALL BE USED AS AN ENGINEERING
BASELINE FOR PRELIMINARY DRAWINGS:

| | |
|---|---|
| Overall Length | - 56,845 mm |
| Length per Bay | - 3,048 mm |
| Overall Width (Bay 2 thru 11) | - 7,925 mm |
| Inside Block Width (Bay 2 thru 11) | - 7,569 mm |
| Neckdown Bay 12 | - 7,569 to 4572mm |
| Inside Block Width (Bay 13 thru 18) | - 4,572 mm |
| Total number of heating zones | - 28 |
| Total number of 3 leg elements | - 1120 |
| Total number of KW @ 3 3/4 KW/element | - 4200 |

89051                          PAGE - 15

A.3   DESIGN        ENGINEERING       SERVICES      (DRAWINGS,
      SPECIFICATIONS   OF   COMPONENTS,   QUANTITY   SURVEY,
      SUPPORTING   CALCULATIONS   FOR   DESIGN   DECISIONS,
      DOCUMENTATION OF PUBLIC DOMAIN SOURCES FOR DESIGN
      DECISIONS, INTERFACE DEFINITIONS, OPERATING DESIGN
      CRITERIA, CAPABILITY, AND LIMITATIONS) PROVIDED FOR
      ALL COMPONENTS NECESSARY TO COMPRISE A COMPLETE
      OPERATIONAL FLOAT BATH DESIGN, INCLUDING BUT NOT
      LIMITED TO THE FOLLOWING:

Tweel block and raise/lower mechanism (2)

Crutch block & support

Canal lip and spout refractories and casing

Bay O cover

Lip & spout casing

Lip & spout refractories

Dross box

Dross box cover

Bath support steel (upper and lower)

Bath casing steel (upper and lower)

Baffle plates

Bottom steel roller assemblies

Bottom & sidewall block

Graphite liner

Bottom block studs & hardware

Restrictor tile

Wet back tile

Roof refractories & support steel

Upper casing sidewall fire brick

Side wall block

Atmosphere cooled exit lip plate

Heating elements

89051                                    PAGE - 16

Zone power supply support steel

Zone power supply electrical distribution

Transformer primary electrical cable & tray layout

Transformer secondary cable and cable tray layout

Heating element bus bars & hardware

Heating element bus bar tap boxes

Heating element cable & hardware

Side seals

Atmosphere blending and distribution system (from tank
farm feed at building wall to bath)

All miscellaneous brackets & other details

Railings, ladders, stairs, grating

Bath bottom cooling fans

Bath bottom cooling ductwork

Field Controls Layouts:

    Zone power supply

    Atmosphere

    Cooling wind start/stop

    Temperature monitoring

        Upper chamber

        Bottom casing

        Tin

        Exit lip

        Cooling wind

        Nitrogen/Hydrogen

        Glass

    Bath pressure monitoring

    Nitrogen/Hydrogen pressure and flow

    Tweel

89059                              PAGE - 17

Top roll machine

Coolers and cooler cart assemblies

B.   GENERAL CLARIFICATIONS

The   customer   shall   provide   sufficient   information
concerning his particular installation, to allow for the
completion of designs and layouts.

II.      SCHEDULING

Stewart Engineers & Associates, Inc. estimate that the above
engineering can be completed 26 weeks after receiving your
purchase order.

Phase 1A

Week 1                    -- Establish design criteria

Week 2                    -- Tin bath layout

Week 3 - 5                -- Tin bath assembly sections

Week 6 - 8                -- Bottom block layout

Week 9 - 10               -- Roof refractory layout

Week 11                   -- Casing assemblies

Week 12                   -- Support steel

Design Review and Approvals

Phase 1B

Week 1                    -- Bus bar, baffle, atmosphere layouts

Week 1                    -- Bottom cooling layout and assemblies

Week 2                    -- Power supply layouts

Week 2                    -- Instrumentation layouts

Week 2                    -- Atmosphere blending layout and assembly

Week 3 & 4                -- Lip/spout and casing assembly

Week 5                    -- Bay 0 assembly

Week 5                    -- Tweel assembly

Week 6                    -- Dross box & cover assemblies

Design Review and Approvals

89051                          PAGE - 18

Phase 2

Week 1 thru 7   -- Detailing of all assemblies

Design Review and Approvals

III.    PRICING

        TIN BATH ENGINEERING SERVICES ACCOUNTING BREAKDOWN:

        Phase 1

            1A ----------------------------------$   195,000.

            1B ----------------------------------$   130,000.

        Phase 2 ----------------------------------$   125,000.

        Total Price----------------------------------$   450,000.


Leslie T. Stewart

**AGREEMENT:**


This Agreement, made and entered into by and between International Technologies Consultants, Inc., a company with principal offices at 4555 Kingswood Drive, Brighton, Michigan 48116 (hereinafter referred to as "ITC") and Stewart Engineers and Associates, a company with principal offices at 140 Elm Street, Wyandotte, Michigan 48192 (hereinafter referred to as "Stewart"),

WITNESSETH:

**WHEREAS,** ITC has entered into a contract with P.   T. Muliaglass (hereinafter referred to as the "Customer"), an Indonesian corporation, for the purpose of managing the design, fabrication, installation and putting into operation of a float glass manufacturing plant in Indonesia as well as actually designing, fabricating, installing and putting into operation the tin float bath component of the plant and by reason thereof requires the assistance of those having expertise in the design, fabrication and installation of tin float baths; and

**WHEREAS,** Stewart is a company with established expertise in the design, fabrication and installation of tin float baths for float glass manufacturing plants and by reason thereof is desirous of assisting ITC in fulfilling its contractual obligations with the Customer with respect thereto;

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, the parties agree as follows.

### Article 1.   RETENTION OF STEWART BY ITC

ITC hereby retains Stewart for the purpose of designing, fabricating, installing and putting into operation the tin float bath component of the float glass manufacturing plant for the Customer in Indonesia, all in accordance with the requirements set forth in ITC's contract with the Customer.

### Article 2.   COMPENSATION

Stewart has heretofore supplied ITC with a budget for accomplishing the work effort involved in designing, fabricating, installing and putting into operation the tin

EXHIBIT C

float bath component, which budget formed the basis of ITC's negotiated fixed price contract with the Customer. ITC and Stewart hereby agree that such budget shall not form the firm basis of compensation to Stewart but rather shall serve simply as a reference point for their mutual efforts to control costs. ITC agrees to compensate Stewart by reimbursing it for one hundred percent (100%) of the costs incurred by Stewart in performing the work called for in ITC's contract with the Customer, which costs shall include budgeted labor charges for the services of the staff of Stewart but shall not include any profit.

With regard to the foregoing paragraph, it is mutually agreed between ITC and Stewart that Stewart will advise ITC and obtain approval from ITC in advance of any and all costs to be incurred by Stewart in performing the work called for in ITC's contract with the customer. ITC and Stewart also agree that Stewart will not make any financial commitments to any third party in performing the work called for in ITC's contract with the customer without the prior approval of ITC.

It is further understood and agreed by ITC and Stewart that reimbursements made by ITC to Stewart will be made from funds received by ITC from the customer for work performed pursuant to the contract between ITC and the customer. ITC will promptly inform Stewart when funds have been received from the customer for work performed pursuant to the contract with the customer and will advise Stewart when reimbursements can be made to Stewart.

In addition, ITC shall pay to Stewart one third (33%) of the balance remaining at the end of the contract's performance (if any) between the total amounts received by ITC pursuant to its contract with the Customer and the total amounts paid out to Stewart as cost reimbursement items pursuant to this Agreement.

### Article 3.  COST CONTROL

Both parties to this Agreement undertake to exercise their best efforts to control and minimize the costs incurred in performing the contract for the supply of the tin float bath component. In this regard, the budget supplied by Stewart to ITC, as amended from time to time in the future, shall serve as a guideline for such control. Beyond this, the parties agree to keep each other fully advised on a timely basis of any facts or factors which may result in a variance between the budget and actual cost so that decisions on dealing with such variances can be made on a mutually cooperative basis.

### Article 4.  RIGHT OF AUDIT

ITC and Stewart agree that either party has the right, at
its own expense, to obtain a reputable and independent firm
of accountants for the purpose of auditing the accounts of
the other party, provided that:

    1.   reasonable notice is given in writing to the
other  party of the intent to conduct an audit;

    2.   any audit will be conducted using generally
accepted   accounting principles;

    3.   any audit will be conducted during normal
business  hours with at least seven days notice in
advance of the   start of the audit;

    4.   any audit will be confined only to financial
matters between ITC and Stewart with regard to the work
performed by Stewart pursuant to the contract between
ITC and the customer.

### Article 5.  EXCLUSIVITY

In consideration of ITC's having retained the services of
Stewart for the project which is the subject of this
Agreement, which project is anticipated to be the first of
many, and having established a profit sharing relationship
between itself and Stewart, Stewart hereby agrees that it
will not offer its services with respect to the design,
fabrication, installation or putting into operation of tin
float baths to persons or entities other than ITC for a
period of five years from the date hereof.

### Article 6.  INTELLECTUAL PROPERTY

The parties hereby agree that any intellectual property in
the form of new designs, processes or equipment that may be
developed by Stewart in the course of performing its
services pursuant to this Agreement shall become the
property of ITC.   In this regard, Stewart agrees to execute
any and all documentation necessary to reflect such
ownership.

### Article 7.  VALIDITY, CONSTRUCTION AND ARBITRATION

Any dispute concerning this Agreement, in particular as to
its existence, validity, interpretation, performance or non-
performance, whether arising before or after the expiration
of the Agreement, shall be settled by binding arbitration.
The seat of the arbitration shall be Detroit, Michigan, and
shall be conducted in accordance with the rules of the
American Arbitration Association as effective on the date of
the filing of any request for arbitration.   The decision of
the arbitration forum shall be final and binding upon the
parties.   The validity and construction of this Agreement

shall be interpreted and construed according to the laws of the State of Michigan.  Each of the parties hereto hereby irrevocably submits itself to the jurisdiction of any courts having jurisdiction over the party for the enforcement of any final decision, which may include costs of such arbitration referred to above.

### Article 8.   CONFIDENTIALITY

The parties have heretofor executed an agreement entitled Confidentiality Agreement Between Firms which was signed by the parties on June 5, 1989 and is attached hereto as Exhibit A.  The parties agree and wish to reaffirm that the terms and conditions of that agreement are still valid and remain in force throughout the duration of this agreement. Further, the parties intend to add the P. T. Muliaglass Project to the list attached to the original of the afore mentioned confidentiality agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be signed in duplicate by their duly authorized representatives, as of this 22nd day of August, 1990.


**International Technologies Consultants, Inc.**


By _____


**Stewart Engineers and Associates**


By_____



THIMBLE\TOP ROLL DRIVES

UTILITY ROOM

ZONE SCR DRIVES

| | UNDERSCORED TOLERANCES | | |
|---|---|---|---|
| DECIMAL PLACES | ± DR | + DR | |
| | | | |
| | | | |

This material is CONFIDENTIAL and is the exclusive property of International Technology Incorporated, Inc. and is being loaned to the recipient on the condition that it be kept in confidence by the recipient and not be disclosed to others or reproduced, in whole or in part, without the prior written consent of International Technology Incorporated, Inc.

STEWART
ENGINEERS & ASSOCIATES

© 1990
INTERNATIONAL TECHNOLOGIES ENGINEERED, Inc.
4555 KINGSWOOD DRIVE
BRIGHTON, MI 48116
U.S.A.

itc

TITLE

PT MULIAGLASS PROPOSAL

PROJECT

500 METRIC TON FLOAT BATH

EXHIBIT D



985.4

BOTTOM OF LEVEL PLATE

TREADPLATE

BASE PLATE
LEVEL PLATE

GROUT

**STEWART**
ENGINEERS & ASSOCIATES

© 1990
INTERNATIONAL TECHNOLOGIES INCORPORATED, Inc.

4555 KINGSWOOD DRIVE
BRIGHTON, MI. 48116
U.S.A.

**itc**

This drawing is CONFIDENTIAL and is the exclusive property of International Technologies Consultants, Inc. and is licensed subject to the condition that it is NOT to be copied or used to furnish information for the making of drawings or prints except as sanctioned in writing by International Technologies Consultants, Inc. and shall be returned upon request

| | UNSPECIFIED TOLERANCE | | | |
|---|---|---|---|---|
| | MILLIMETERS | | INCHES | |
| | DECIMAL PLACES | + OR – | DECIMAL PLACES | + OR – |
| | .0 | .8 | .00 | .03 |
| | .00 | .13 | .000 | .006 |
| | .000 | .013 | .0000 | .0005 |

TITLE     PT MULIAGLASS PROPOSAL

PROJECT     500 METRIC TON FLOAT BATH

| SCALE | SHEET |
|---|---|
| 1:25 | 1 of 2 |

DRAWING No:
ITC\PROPSL



## Bill of Materials

| ITEM | QUAN. | DESCRIPTION |
|---|---|---|
| 505 | 2 | KNURL HEAD ASSEMBLY - WELDED CONSTRUCTION STRESS RELIEVE |
| A24 | 2 | 6-1/4 DIA. x 4-1/2 LG. #316 S.S. |
| B24 | 2 | 4-1/2 DIA. x 1-1/4 LG. #316 S.S. |
| C24 | 2 | 5-3/4 DIA. x 3/8 LG. #316 S.S. |
| D24 | 2 | 7 DIA. x 3/4 LG. AISI 1141 |

DETAIL 'B' - 4-1/2 DIA. x 1-1/4 LG.
- [114.3 DIA. x 31.8 LG]

22.5°

4.50 [114.30]

Ø0.562-THRU
[14.27]

R0.25 [6.4]

1.380 [35.05] 60° INCL.

#4.18 [106.17]

R0.25 [6.4]

1.250 [31.75]
0.34 [8.64]
0.56 [14.22]
0.75 [19.05]
0.81 [20.57]

▲ 3/16 DRILL THRU
▲ [5.0] DRILL THRU
CHAMFER BOTH SIDES
(16) HOLES

2.656 [67.46]

This drawing is CONFIDENTIAL and is the exclusive property of International Technologies Consultants, Inc. and is loaned subject to the condition that it is NOT to be copied or used to furnish information for the making of drawings or prints except as sanctioned in writing by International Technologies Consultants, Inc. and shall be returned upon request.

**STEWART** ENGINEERS & ASSOCIATES

© 1990
INTERNATIONAL TECHNOLOGIES CONSULTANTS, Inc.
itc   4555 KINGSWOOD DRIVE
BRIGHTON, MI 48116
U.S.A.

| | UNSPECIFIED TOLERANCE | | |
|---|---|---|---|
| | MILLIMETERS | INCHES | XXX |
| DECIMAL PLACES | + OR - | DECIMAL PLACES | + OR - |
| .0 | .8 | .00 | .03 |
| .00 | .13 | .000 | .005 |
| .000 | .013 | .0000 | .0005 |

| TITLE | TOP KNURL MACHINE KNURL HEAD ASSEMBLY - WELDMENT | SCALE FULL | SHEET 24 of 24 | D |
|---|---|---|---|---|
| PROJECT | 500 METRIC TON FLOAT BATH | DRAWING No: MG1\30-B-020 | | |

DEPOSITION
EXHIBIT 201
STEWART
7-23-91



SECTION C-C

VIEW A
SHOWN 5 x SCALE

SECTION B-B
SHOWN 5 x SCALE



Arabian United Glass                                                    4 April 2007
New Alkariya Buildings
Almalaz Al Si Teen Street
4th Floor Office No. 4203
Riyadh - KSA
Saudi Arabia


Subject:        Arabian United Float Glass Company

Att'n:          Mishaal Al-Orayer

It is our understanding that the Arabian United Float Glass Company (AUFGC) is involved in a project to build
a float glass manufacturing facility in Yanbu, Saudi Arabia wherein the SIDF will be providing financing. In
addition, this project is a joint venture between AUFGC and Mulia Industrindo (Mulia) and will utilize the
services of Shanghai Pony Technologies (SPT) and International Technologies Consultants (ITC) as float
technology providers.

We have grave concerns about the ownership of the float technology being used in this facility. Each of the
facilities that use StewartFloat technology are individually licensed and are not allowed to utilize that technology
for the building of additional facilities or the creation of other designs without the express permission of Stewart
Engineers. In order to limit your liabilities and ensure the success of this project, you must consider the history
of those involved and question the following:

- Who developed and owns the float technology being used?
- Is the design being used complete?
- Can the technology provider demonstrate that the technology originated with them and that the
  copyrights and intellectual property rights of others have not been infringed?
- Has the float technology provider successfully completed previous projects or have they left the projects
  prior to completion?
- Is there a history of deception and lawsuits related to previous projects?

The following information is being provided to you, tracing Stewart's ownership of its float technology.

## StewartFloat® Background

- Mulia Project

  In August of 1989, Stewart agreed to supply a complete float bath furnace design and all materials for a new
  float glass facility that was to be built for Mulia in Jakarta, Indonesia wherein ITC was to be the project
  manager and did not contribute to the design of the float bath. At this time Guardian Industries filed a
  lawsuit against Stewart alleging that Stewart "created unfair competition" and would be "unjustly enriched"
  through its participation in the Mulia project.

27560 Cahill Road          Tel: (01) 734.793.1008          info@stewartengineers.com
Flat Rock, MI 48134 USA          Fax: (01) 734.793.1004          www.stewartengineers.com

EXHIBIT E

2:07-cv-13391-JAC-MJH   Doc # 1   Filed 08/14/07   Pg 49 of 50   Pg ID 49

In October of 1991, Stewart and Guardian Industries negotiated an agreement that was approved by and entered into the records of the Wayne County (State of Michigan, USA) Circuit Court (89-928108-CZ). This agreement, in the form of a "Consent Decree", provides Stewart with both Guardian's and the Court's authority to design, supply, install, and operate float bath furnaces on a Worldwide basis, without limitation. ITC, Mulia, and SPT are not parties to that agreement. The only agreement that remains in place between ITC/Mulia and Stewart is a non-disclosure of confidential information agreement that prohibits ITC/Mulia from using any Stewart proprietary technology.

During this same period, ITC also agreed to a "Consent Decree" that limits ITC to the use of a single design that was defined as the "Greenler Design". The "Greenler Design" included a very limited set of specific dimensions and did not provide for the use of any designs from any other party, thereby severely limiting ITC's ability to provide a complete float bath design.

Stewart continued it's technical support to the Mulia project throughout its completion. During this same period, Mulia informed ITC that they were not satisfied with ITC's performance and ITC was relieved of all project contractual duties. At that time, Shaofeng Lee (SPT) was brought into the project by Mulia, as a consultant, to review our StewartFloat[x] technology and monitor our progress, and as a result SPT gained full access to StewartFloat[D] designs, of which SPT has not been granted any rights by Stewart with regard to the use of those designs in any manner.

- U.S. Justice Department

On October 9, 1992 Pilkington, Guardian Industries, LOF, Ford Motor Company Glass Division, PPG Industries, AFG, and Stewart Engineers were served with "Civil Investigative Demand" papers from the United States Department of Justice Antitrust Division concerning possible violations of the Sherman Anti-Trust Act by Pilkington associated companies (USA District Court CIV-94-345-TUC-WDB).

This action by the Justice Department indicates that they believed that enough evidence had been presented, concerning interference with Stewart, that there was a reason to investigate the activities of Pilkington, Guardian, and others. The United States Justice Department investigated possible "Anti-Trust" violations by Pilkington and their associated companies.

The final ruling was made that allows those USA companies that have legitimately developed or procured float bath technology (e.g. Stewart Engineers) to sell or use it on a worldwide basis.

Following the Mulia project, every project (15+) that Stewart has started, has also been completed without any legal action being brought by any party.

## ITC Background

The following information, concerning ITC float projects, has been obtained from public documents, and demonstrates ITC's project history.

- Tenneco, Norway
  - ○ ITC started in1985 and is terminated in 1985
  - ○ Tenneco abandons the project in 1986

● Page 2

- U.S. Glass, USA
    - o   ITC started in 1988 and abandons in 1989
    - o   ITC (plaintiff ) vs Pilkington, Guardian Industries, AFG Industries (USA District Court CIV-93-552-TUC-WDB)
- Mulia Industrindo, Indonesia
    - o   ITC started in 1990 and is terminated in 1991
    - o   Court prohibits ITC from using Stewart float bath design in 1991
    - o   ITC (plaintiff) vs Leslie T. Stewart, Stewart Engineers, PT Muliaglass and Sidley & Austin (State of Michigan Circuit Court County of Wayne (91-121426 CZ) (1991)
        - ▪   ITC alleges ownership claims, to the project and materials, that are refuted by Mulia
    - o   Stewart remained on the project that began production in 1992
- EuroGlas (Glass Troesch), France
    - o   ITC started in 1991 and is terminated in 1992 (Stewart alleges that ITC copied StewartFloat designs from Mulia project)
    - o   Stewart supports float technology provided to EuroGlas by ITC
    - o   ITC (plaintiff ) vs Pilkington, Guardian Industries, AFG Industries (USA District Court CIV-93-552-TUC-WDB)
        - ▪   Leslie T. Stewart is deposed on behalf of Pilkington and for the purpose of demonstrating that ITC copied the Stewart float bath design from Mulia and provided it to EuroGlas.
    - o   Began production in 1994
    - o   ITC vs. EuroGlas, USA Court of Appeals, Sixth Circuit, ( 94-1200) (1997)
        - ▪   ITC fails at its attempt to receive compensation from EuroGlas.

A float glass manufacturing project represents a large investment for anyone, and only those that are competent and can be trusted, should handle its implementation. More details can be provided to you from the referenced court cases or from the public records.

Sincerely,

Leslie T. Stewart
President