UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INTERNATIONAL TECHNOLOGIES
CONSULTANTS, INC.,

        Plaintiff,

v.                                                                                  Case No. 07-13391
                                                                                    Honorable Julian Abele Cook, Jr.
LESLIE T. STEWART and STEWART ENGINEERS
& ASSOCIATES, INC.,

        Defendants.


<u>ORDER</u>

This litigation involves claims by the Plaintiff, International Technologies Consultants, that

the Defendants, Leslie T. Stewart [1] and Stewart Engineers & Associates, Inc., had (1) committed

acts of unfair competition, contrary to the provisions of §43(a) of the Lanham Act, 15 U.S.C. §

1125(a)(1)(B), (2) participated in unfair competition in violation of the common law, (3)

intentionally interfered with its contractual relations, (4) purposefully interfered with an existing

business relationship or expectancy, and (5) engaged in trade libel.

On August 23, 2007, the Plaintiff filed a motion, seeking to obtain a preliminary injunction

that would prevent these two Defendants from engaging in conduct which had allegedly caused it

------

[1]Leslie T. Stewart is the president, director, and sole shareholder of Stewart Engineers &
Associates, Inc.

to suffer irreparable damages to its business interests.[2]  In its complaint, the Plaintiff has accused the Defendants of wrongfully communicating misleading statements to its customers and business associates within the float glass industry which, in turn, have substantially damaged its reputation within this business community.  The Plaintiff has also charged the Defendants with attempting to disrupt its work on a current project in the Middle East, as well as other commercial relationships, through the dissemination of "false or misleading descriptions or representations of fact" regarding the ownership of certain float glass technology rights.[3]  The Defendants, in a timely response, have expressed their collective opposition to this motion.

## I.

The parties to this litigation, both of whom are business competitors within the float glass industry, submitted bids to the Arabian United Float Glass Company ("Arabian United Company") in separate efforts to secure a work assignment in connection with the development of a float glass plant in Yanbu, Saudi Arabia.[4]  The Arabian United Company ultimately awarded the contract to the team on which the Plaintiff was a member.[5]

-----

[2]On September 20, 2007, the Court entered an order that directed the Defendants "to refrain from communicating, or attempting to communicate - directly or indirectly - with any non-parties, whom they know, or have reason to know, have or may have an actual or prospective business relationship with the Plaintiff relating to matters which pertain to the float glass technology."

[3]The Plaintiff described its commercial product, which is mentioned frequently by the parties in this litigation, as "flat glass manufactured through the 'float process,'" that has "considerable cost and quality advantages over flat glass manufactured through alternative processes (plate glass or sheet glass)."

[4]Although the exact date is unclear from the record, it appears that the bids were submitted in 2006.

[5]The project had been originally awarded to Stein Hurtley, a European company which employs the technology that had been supplied by the Defendants.  The Plaintiff had partnered

On April 4, 2007, the Defendants sent a letter[6] to the Arabian United Company which called into question the reliability of the Plaintiff as a float glass consultant, as well as its ownership of the float glass technology that would be utilized during the Yanbu project.[7]  At the same time, the Defendants sent a similar letter to the company that provided the financing for this project. Contrary to the Defendants' unsupported assertions, the Plaintiff contends that the design being used in this project "is not the outdated Euroglas design, Muliaglass design nor any [Stewart Engineers & Associates] design . . . ," but rather it is a design "'purpose built' to suit the requirements of the client in Saudi Arabia using [its own]-acquired skill and knowledge,

with the Shanghai Pony Technologies Company Ltd. in its bid on the Yanbu project.  However, for reasons that do not appear to have any relevancy to this motion, the Arabian United Company terminated its agreement with Stein Hurtley and, thereafter, entered into a contract with the Shanghai Pony Technologies Company.

[6]The three page letter, which opens with a reference to the Yanbu project and all of the other parties involved, thereafter asserts that:

> [The Defendants] have grave concerns about the ownership of the float technology being used in this facility. . . In order to limit your liabilities and ensure the success of this project, you must consider the history of those involved and question the following:
> • Who developed and owns the float technology being used?
> • Is the design being used complete?
> • Can the technology provider demonstrate that the technology originated with them and that the copyrights and intellectual property rights of others have not been infringed?
> • Has the float technology provider successfully completed previous projects or have they left the projects prior to completion?
> • Is there a history of deception and lawsuits related to previous projects?

The letter then gives a chronicle of the "StewartFloat®" and the Plaintiff's project history.  It closes by opining that "only those that are competent and can be trusted, should handle [float glass technology's] implementation."

[7]The Defendants claim, without providing any evidence or explanation in their response to this pending motion, that the Plaintiff "implie[d] that it will be using, the 'StewartFloat®' technology," developed by Stewart Engineers & Associates.

information owned by [it], and information found in the public domain."

II.

The dispute between the parties regarding the ownership of the float glass technology centers around a nearly two decade old accord between the parties. On June 5, 1989, the Plaintiff and Stewart Engineers & Associates executed a confidentiality agreement in anticipation of working together for an extended period of time. However, the passage of time produced a disagreement among the parties over the scope and purpose of their agreement which reads, in pertinent part, as follows:

> 2.      No copies will be made or retained of any written information supplied.
>
> 3.      At the conclusion of our discussions, or upon demand by [Stewart Engineers & Associates], all information, including written notes, photographs, memoranda, notes taken by [the Plaintiff] shall be returned to [Stewart Engineers & Associates, Inc.].
>
> 4.      This information shall not be disclosed to any employee or consultant unless they agree to execute and be bound by the terms of this agreement.

The Defendants contend that this agreement was drafted in anticipation of their working in close harmony on various float glass manufacturing projects which would allow the Plaintiff to have access to and the use of Stewart Engineers & Associates's trade secrets. It is the Plaintiff's position that this agreement was narrowly tailored to the "U.S. Glass" project - a float glass project which began in 1988 and ended during the following year.[8] In their agreement, the parties also indicated that "the Company has or shall furnish to the undersigned certain confidential information, *as set forth on [the] attached list . . .*" (emphasis added). However, neither party has been able to produce

---

[8]"U.S. Glass" is listed in the preamble of the 1989 confidentiality agreement as a party to this agreement.

the "list," to which they made reference in the agreement. They also disagree about its relevance to this controversy.

The Defendants contend - without providing the Court with any evidence upon which to support their assertion - that even though their agreement contemplated such a list, it was an understanding among the parties that their joint commitment covered all of the technical information regarding the manufacturing of the float glass that had been provided by them to the Plaintiff, in addition to other information that is generally known in the industry. The Plaintiff disagrees, contending that this agreement is null and void, noting that it "was expressly limited by its terms to 'certain confidential information, as set forth in the attached list.'"

In its evaluation of this narrow issue, the Court concludes that inasmuch as (1) the Plaintiff's position is much more plausible than that which was advanced by the Defendants, (2) the confidentiality agreement was expressly limited by its terms to "certain confidential information, as set forth in the attached list," and (3) the parties have not produced any such list, this 1989 confidentiality agreement is - only for the purpose of this motion - a nullity.

The record indicates that the post-1989 business dealings between these parties consisted of two projects; namely, (1) float bath design services that pertained to a plant to be built in Europe (the "EuroGlas Project"), and (2) engineering services that related to a plant to be built for an Indonesian corporation, P.T. Muliaglass (the "Muliaglass Project").

### The EuroGlas Project

On March 7, 1990, the Plaintiff and Stewart Engineers & Associates signed an agreement relating to the "EuroGlas Project," the pertinent provisions (i.e., those related to royalties and payments, payments to the engineer, and the invention agreement) are as follows:

2.3.1 The Engineer [Stewart Engineers & Associates] engages itself not to violate any rights (patents and royalties, etc.) of third parties in fulfilling this agreement *and to use only public domain information.* (emphasis added).

. . .

8.2 The Engineer warrants and guarantees that title to all work (including sketches, drawings, and computer discs) covered by an application for payment will pass to the Owner [the Plaintiff] upon receipt of such payment by the Engineer free and clear of all liens, claims, security interests or encumbrances.

. . .

INVENTION AGREEMENT

12.1 For good consideration, and in consideration of the Engineer being employed by the Owner; the Engineer hereby agrees, acknowledges and represents:

12.1.1 The Engineer, during the course of this Project, shall promptly disclose in writing to the Owner all inventions, discoveries, improvements and innovations which:

      a.      Result from any work performed on behalf of the Owner, or pursuant to a suggested project by the Owner, or

      b.      Relate in any manner to the existing or contemplated business of the Owner, or

      c.      Result from the use of the Owner's time, material, employees or facilities.

12.1.2 *The Engineer hereby assigns to the Owner, it's successors and assigns, all right, title and interest to said inventions* (emphasis added).

12.1.3 The Engineer shall, at the Owner's request, execute specific assignments to any such invention and execute, acknowledge, and deliver any additional documents required to obtain letters patent in any jurisdiction and shall, at the Owner's request and expense, assist in the defense and prosecution of said letters patent as may be required by the Owner. This provision shall survive termination of the Engineer's employ with the Owner.

Although §8.2 expressly deals with the transfer of title for design work, it also establishes a

prerequisite condition for payment. On this issue, the Plaintiff contends that throughout the

EuroGlas Project it made payments to Stewart Engineers & Associates in the amount of

$1,069,617.[9] Notwithstanding this assertion, the Defendants submit that the Stewart Engineers & Associates firm was not fully compensated for its work under this agreement.

The Muliaglass Project

On August 22, 1990, the parties entered into an agreement which was similar to that used in the EuroGlas Project. The relevant provision regarding the parties' use of intellectual property is the following:

Article 6.        INTELLECTUAL PROPERTY

The parties hereby agree that any *intellectual property in the form of new designs, processes or equipment that may be developed by* [*Stewart Engineers & Associates*] in the course of performing its services pursuant to this Agreement shall become the property of [the Plaintiff]. In this regard, [Stewart Engineers & Associates] agrees to execute any and all documentation necessary to reflect such ownership (emphasis added).

The Defendants maintain that they did not develop "any new designs, processes, agreements, sketches or technology for either of the [two projects]." Thus, in their opinion, there was nothing for them to assign to the Plaintiff under any circumstances. Moreover, they argue that the Plaintiff terminated all of their agreements (with the exception of the confidentiality agreement of 1989), as reflected in a letter of June 6, 1991.[10]

---

[9]It is the contention of the Plaintiff that every payment prior to the termination of the EuroGlas Project agreement, with the exception of the retainage, was made. Moreover, the Plaintiff contends that the prerequisite conditions for the retainage were neither met nor was its payment relevant to the transfer of rights. The Plaintiff provided the Court with records which purported to show these payments. On the other hand, the Defendants, without providing any evidence for their assertion, reiterate that (1) they were not fully paid for their work and (2) the Plaintiff does not own the technology it produced.

[10]The so-called "termination letter" that was transmitted to the Defendants on June 6, 1991 by the Plaintiff, states, in relevant part, the following:

[W]e are hereby notifying you of the termination, effective today, of the agreements

The Plaintiff disagrees, countering the Defendants' first assertion by citing to the deposition[11] testimony of Leslie T. Stewart, in which he stated the following:

> Q. The design that you created for Indonesia and EuroGlas belongs to [the Plaintiff]; is that right?
> A. They purchased the design, yes.
> Q. So you are not free to sell that design to somebody else, true?
> A. That's correct.

### III.

In its motion, the Plaintiff argues that the Defendants' conduct supports its belief that (1) it is likely to prevail in this case against the Defendants and (2) a jury will ultimately find in its favor on the relevant counts (i.e., violation §43(a) of the Lanham Act, tortious interference, and trade libel). Furthermore, the Plaintiff submits that the granting of a preliminary injunction is in the best interests of the public under the circumstances that have been outlined in its complaint. Moreover, it fears that a failure to grant the requested relief would result in irreparable harm to its reputation.

The Defendants disagree, contending that the Plaintiffs have not satisfied their burden under

---

between [the Plaintiff] and [Stewart Engineers & Associates], including without limitation, that certain agreement dated August 22, 1990 by and between [Stewart Engineers & Associates] and [the Plaintiff] and all other commitments and agreements, undertakings and understandings, whether written or oral, between [Stewart Engineers & Associates] and [the Plaintiff], other than those relating to the confidentiality and non-disclosure of trade secrets, proprietary information and other confidential information, covenants against competition and territorial exclusivity.

[11]The deposition was taken during a lawsuit brought by Guardian Industries Corporation ("Guardian") against the Plaintiff, the Defendants, and Dean Wiley for having misappropriated its trade secrets. However, the Defendants dispute the context of these statements, arguing that the deposition was given on the assumption that the Plaintiff would "perform its written and oral agreements with Stewart Engineers & Associates to compensate it for services rendered on those projects." Again, the Defendants have not provided the Court with any evidence that the Plaintiff did not fully pay them for their services.

the generally accepted standards that must be met when seeking injunctive relief.

IV.

The decision to grant injunctive relief is within the discretion of the district court. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996), *cert. denied*, 519 U.S. 807 (1996). A preliminary injunction serves to protect the status quo pending a final determination of the lawsuit. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In granting a preliminary injunction, a court must determine whether:

1. the plaintiff has shown a likelihood of success on the merits;

2. irreparable harm could result to the plaintiff if the preliminary injunction is not issued;

3. the threatened harm to the plaintiff outweighs the threatened harm that the injunction may inflict upon the defendant; and

4. the granting of the preliminary injunction will serve the public interest.

*Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *Lowry Computer Prod., Inc. v. Head*, 984 F. Supp. 1111, 1113 (E.D. Mich. 1997). Although these four outlined considerations are not obligatory, they are factors that must be balanced in order to weigh the claims of irreparable harm and likelihood of success on the merits by the aggrieved party. *Id.* However, the Sixth Circuit Court of Appeals has described the issuance of a preliminary injunction as an "extraordinary" remedy that "should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). A district court must make specific findings relating to each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). However, no single factor - when standing alone - is dispositive.

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). A decision by a district court is reviewed solely for an abuse of its discretion and will be reversed only "in the rarest of circumstances." *In re Eagle-Picher Industries*, 963 F.2d 855, 858 (6th Cir. 1992).

Finally, and despite the seemingly mandatory language of Fed. R. Civ. P. 65(c),[12] the Sixth Circuit Court of Appeals has indicated that those issues which relate to the necessity of a bond and the amount of security are left to the discretion of the district court. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). The advisory committee notes demonstrate that the revised rule is not meant to change the meaning of this rule.[13]

In addressing the first factor in *Jones*, the Plaintiff submits that it is likely to win on all three of its claims against the Defendants. The first allegation is based a claimed violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the third is based on an intentional interference with contractual remedies, and the fifth is based on trade libel.[14] Each of these three counts are discussed and evaluated below.

---

[12]Fed. R. Civ. P. 65(c) states, in pertinent part, that "[t]he court may issue a preliminary injunction . . . *only if the movant gives security* in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" (emphasis added).

[13]Under "2007 Amendments," the Advisory Committee Notes to Fed. R. Civ. P. 65(c) state, in pertinent part, that:

> The language of Rule 65 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. *These changes are intended to be stylistic only.*

(emphasis added)

[14]The Plaintiff did not address counts two (common law unfair competition) and four (intentional interference with business relationship or expectancy) in this request for injunctive relief.

<u>A. Count I: Lanham Act § 43(a)</u>

Section 43(a) of the Lanham Act establishes a claim for misrepresentation in commercial advertising or promotion. 15 U.S.C. § 1125(a)(1) provides in pertinent part that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
> . . .
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The following is an appropriate test to apply in a false advertising suit under § 43(a):

> [A] plaintiff must prove that the defendant's ads were false or misleading, actually or likely deceptive, material in their effects on buying decisions, connected with interstate commerce, and actually or likely injurious to the plaintiff.

*Janda v. Riley-Meggs Industries, Inc.*, 764 F.Supp. 1223, 1228 (E.D. Mich. 1991) (quoting *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir.1990)) (citations omitted).

The Defendants contend that the Plaintiff has failed to establish that the alleged misrepresentations within their now-challenged letters to the Arabian United Company were false and material. They submit that it is "most fundamental" that the statements in the letter are not false representations of fact and, hence, injunctive relief should not be granted. However, the Defendants do not cite any legal authority to support of this argument. Moreover, there is binding precedent which runs directly contrary to their assertions. In *Balance Dynamics Corporation v. Schmitt Industries*, 204 F.3d 683 (6th Cir. 2000), the court reaffirmed its holding of *American Council of Certified Pediatric Physicians and Surgeons v. American Pediatric Surgery, Inc.*, 185 F.3d 606, 618 (6th Cir. 1999) which stated that "injunctive relief may be obtained by showing only that the

11

defendant's representations about its product have a tendency to deceive consumers." Furthermore, the Sixth Circuit of Appeals has determined that a showing of actual confusion [deception] is not a prerequisite to recovery of "damage control expenses" even though such an award is monetary in nature. "Damage control expenses must be treated differently from marketplace damages because, like an injunction, damage control is undertaken precisely to prevent such things as lost sales, lost profits, and lost good will." 204 F.3d at 691.

Next, they argue that the Plaintiff - as the moving party - has failed to demonstrate a strong likelihood that the letter of April 4, 2007 constitutes a "commercial advertising or promotion" under the aforementioned statutory language. This argument is based upon the proposition that the alleged misconduct which has been attributed to the Defendants by the Plaintiff in its motion (i.e., the transmission of the letter in April 2007) is neither commercial advertising nor a promotion, as contemplated (although not specifically defined) in the Lanham Act.

However, the Plaintiff does note that the court in *Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1026 (S.D. N.Y. 1994), found a single letter to be a violation of § 43(a) of the Lanham Act due to the direct competition between the parties (the recipient was an active purchaser and the letter was written to influence a purchase decision). Although the Defendants challenge the Plaintiff's reliance on the opinion of *Mobius*, citing to a rejection by the Second Circuit of its approach in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) ("businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action."), they fail to grasp the spirit of the holding in *Fashion Boutique;* namely, that "whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham

Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Id.* In *White Mule Co. v. ATC Leasing Co.,* 540 F. Supp. 2d 869, 897, the court noted that "commercial advertising or promotion" under the Lanham Act is defined as:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. *While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry* (emphasis added).

In the case at hand, the Defendants sent a letter not only to the Arabian United Company, but to its financing company as well.[15] The Plaintiff observes that it has not alleged that its motion is based upon a single letter sent to one customer. Rather, it notes that the April 4, 2007 letter was sent to the Arabian United Company, whereas a second and similar letter was transmitted to the company that provided financing for the Yanbu project. On that basis, the Plaintiff maintains that the conduct at issue in this case is more than a single letter and is thus sufficient to constitute a violation of §43(a) of the Lanham Act. Additionally and prior to the mailing these letters, the Plaintiff and the Arabian United Company had already established a contractual relationship, one which the Defendants now implausibly claim that they did not seek to terminate following the transmittal of their letters.

Given the very small market for float glass plants, the Court believes that the transmission of even a very small number of letters constitutes advertising or promotion "to the relevant purchasing public." 540 F. Supp. 2d at 897. For all of the reasons stated above, the Court believes

---

[15]The Plaintiff also believes that "[s]tatements similar to those contained in the Arabian United Company letter" have been provided to those entities that are responsible for another project with which it is involved in Russia.

that the Plaintiff has shown that it is likely to prevail on the merits of this count.

## B.  Count III:  Tortious Interference with Contract

The law in the State of Michigan authorizes the commencement of a claim for the tortious interference with a preexisting agreement if there is a contract, a breach, and instigation of the breach without justification by another party.  *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 800 (6th Cir. 2007) (citations omitted).  Pursuant to the case law in Michigan, an aggrieved party has the burden of proving each of the following elements in order to establish a claim for tortious interference with contract:

> (1) [t]he existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted.

*EBI-Detroit, Inc. v. City of Detroit, et al.*, 2008 U.S. App. LEXIS 11043, *32 (6th Cir. 2008) (quoting *PT Today, Inc. v. Comm'r of the Office of Fin. & Ins. Servs.*, 715 N.W.2d 398, 422 (Mich. App. 2006)).  Although *Servo* mentions the requisite existence of a "breach," this does necessarily not mean that a termination of the contract must occur.  The third element under *EBI-Detoit* requires proof of "the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's . . . business relationship." *Feldman v. Green*, 138 Mich. App. 360, 369 (1984). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R L Polk Co*, 193 Mich. App. 1, 12-13 (1992).  However, if a plaintiff relies upon the intentional doing of a lawful act that is done with malice and unjustified in law, there must be a demonstration - with specificity - of some affirmative acts by the defendant which corroborate the unlawful

purpose or improper motive of the interference. *Feldman*, 138 Mich. App. at 369-370.

In this case, the likelihood of success of a claim for tortious interference will rest upon the probability of the Plaintiff being able to establish the third element of this cause. Here, the Defendants' letter plainly suggests that, in order to limit liabilities and ensure success of the Yanbu project, the Arabian United Company should reevaluate the Plaintiff's business and legal history as well as the ownership and integrity of its designs. This letter also suggests that the Plaintiff lacks competency and trustworthiness. In summary, the Plaintiff has convincingly identified that which, in its judgment, may have been the Defendants' motive (i.e., improper allegations relating to the ownership of the technology in question, as well as the competency and dependability of the consultants in a presumed effort to disrupt the existing business relationship with the Arabian United Company).

## C. Count V: Trade Libel

Under Michigan law, a plaintiff must proffer the following four elements in order to establish a viable cause of action for libel:

> (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

*Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 393-94 (Mich. App. 1992). With regard to the first element, the Court in *Royal* elaborated upon the meaning and importance of the word "false:"

> [A] defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication.

*Id.* at 394 (citing *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 144 (Mich. App. 1991).  In extending these principles to the business realm, the Michigan Court of Appeals utilized an example of how a corporation can be defamed:  "One who publishes defamatory matter concerning a corporation is subject to liability to it (a) if . . . the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it . . . ." *Heritage Optical Center, Inc. v. Levine*, 359 N.W.2d 210, 212 (Mich. App. 1984) (citing 3 RESTATEMENT TORTS, 2d, § 561 at 159).

In the present case, the only factual assertion or implication within the letter, to which the Plaintiff could presumptively prove false, concerns the ownership of the float glass technology.  Significantly, this issue is at the center of the disagreement between the two parties.  For the purpose of the instant motion as it relates to this claim, the Plaintiff need only prove a substantial probability of success.  *Jones,* 341 F.3d 474, 476.  Here, the Plaintiff has alleged a right to use the technology that it had acquired during its past relationship with the Defendants.  Moreover, it has also maintained that the technology being used in the Yanbu project is not the Defendants' design.  The Plaintiff submits that this technology is one which had been built specifically to accommodate the specifications of the Arabian United Company.[16]  After carefully examining the record, it appears to the Court that the Plaintiff would likely be able to prove each of the following elements; namely, that (1) the Defendants made a false and defamatory statement in an effort to prejudice its business relationships by sending letters which questioned the ownership of the technology being used on the Yanbu project; (2) the Defendants will not be able to prove that the challenged letters

---

[16]The Defendants claim that "[the Plaintiff] implies that it will be using, 'StewartFloat' ® technology,' developed by [them]."  To the contrary, the Plaintiff emphatically denies this allegation, asserting that the Defendants do not have any ownership rights or legitimate claims to the technological design being utilized in the Yanbu project.

were privileged; (3) the Defendants' actions were at least negligent in that they knew or should have known that their letters would cause economic and other damages to the Plaintiff, and (4) the Defendants' conduct is actionable under Michigan law because it was published negligently and the Plaintiff can show economic harm. *Royal*, 495 N.W.2d at 393-94; Mich. Comp. Laws § 600.2911(7).

The second factor in *Jones* revolves around the question of whether the Plaintiff will suffer an irreparable harm if the requested preliminary injunction is not issued. In a decision that was rendered over a century ago, the Michigan Supreme Court held that for "[a]n injury to be irreparable it need not be such as to render its repair physically impossible; but it is irreparable when it cannot be adequately compensated in damages, or when there exists no certain pecuniary standard for the measurement of damages due to the nature of the right or property injured." *Ainsworth v. Hunting & Fishing Club*, 153 Mich. 185 (1908).

In further discussing irreparable harm, the *Heritage* court elaborated upon this principle by noting that "[a] corporation's reputation in a personal sense cannot be defamed. Rather, 'language which casts an aspersion upon its honesty, credit, efficiency or other business character may be actionable.' '[Where] a libel contains an imputation upon a corporation in respect to its business, its ability to do business, and its methods of doing business, the same becomes libelous per se.'" 359 N.W.2d at 212 (Mich. App. 1984) (multiple citations omitted).

In addressing this issue, the Plaintiff contends that the Defendants' letters will taint its reputation which, in turn, will severely impact its ability to do business. The Plaintiff also identifies the harm that, in its opinion, was caused by the Defendants' unsolicited mailings; i.e., a need to "undertake additional obligations in its performance under the contract as technology

17

provider for the [the Arabian United Company facility]." The Plaintiff also notes that it became aware of the Defendants' letter only after having received a copy from the Arabian United Company. Based upon the real potential for damage to the Plaintiff's reputation within the float glass industry, it appears that this factor has been satisfied.

The third *Jones* factor that the Court must weigh in deciding whether to grant a preliminary injunction involves a fact-based inquiry. *Curtis 1000, Inc. v. Martin*, 197 Fed. Appx. 412, 426 (6th Cir. 2006). As such, the Court must examine the circumstances of this case to determine whether the harm that the Defendants might endure if the injunction is granted will outweigh the harm that the Plaintiff may suffer if it is denied. Here, the Plaintiff argues that the requested relief would not cause a harm to anyone, including the Defendants. Rather, it contends that an injunction would merely remove false and misleading statements from the marketplace. However, the Defendants have consistently contended that (1) they are fully justified in expressing their concerns over the ownership of the float glass technology, and (2) any restriction upon the ability to express its concerns would equal, if not exceed, the damage which the Plaintiff seeks to prevent.

In order to identify the potential harm to the Defendants if a preliminary injunction is granted, it is essential to examine that which the Defendants intended to accomplish by sending the letters. In their defense, the Defendants submit that the letters were not "sent for the purpose of influencing consumers to buy [their] services." Rather, they maintain that the letter was mailed to the Arabian United Company in order to (1) raise its awareness as to the ownership of certain float glass technologies and (2) urge it to take certain precautions against imprudent business decisions. More importantly, the Defendants deny that they intended to interfere with the Plaintiff's

relationship with the Arabian United Company.[17]  The Defendants further contend that they "prepared and mailed the letter to further the goals and ideals of the float bath industry as a whole, such that its reputation is not torpedoed by the bad actions of a single participant [in] the industry outlined in the letter."[18]  Even if the Court accepted this explanation that their letters had been sent in an "altruistic" spirit, there does not appear to be any readily visible and potential harm to the Defendants if the Court granted a preliminary injunction in favor of the Plaintiff.  It appears to the Court that issuing a preliminary injunction to prevent similar future misconduct, as alleged in this case, would be negligible in comparison to the harm that the Plaintiff claims to have suffered.

The final *Jones* factor to consider is whether the public interest weighs in favor of granting the request for a preliminary injunction.  In its pursuit of injunctive relief, the Plaintiff suggests that the Defendants' actions impinge upon fair competition which, in turn, runs counter to the interest of the general public in maintaining a free, open and competitive market.  Given these analyses, all of which were designed to consider the parties' positions regarding the claimed misconduct, the Defendants' arguments that its letters were transmitted to the Arabian United Company in pursuit of open and truthful communication does not appear to have merit.  Inasmuch as the general public possesses a strong interest in a marketplace that is open and competitive, this factor has been

---

[17]According to the Defendants, "The letter traces [the Plaintiff's] performance with respect to the Muliaglass Project and then provides information from public documents about [the Plaintiff's] record of performance, suggesting that [the Arabian United Company] review the public record and take such precautions as it deems advisable."

[18]In its reply, the Plaintiff takes issue with these arguments.  In doing so, the Plaintiff asserts that the Defendants' claims are highly dubious because the letter-in-question was sent directly to the Arabian United Company.  The Plaintiff argues that if the Defendants had genuine concerns about the ownership of the technology, they could have, and should have, contacted it directly.

satisfied by the Plaintiff.

V.

The Sixth Circuit leaves the requirement as to the amount of a bond, if any, to the discretion of the trial court. Nevertheless, the Court "must expressly consider the question of requiring a bond before issuing a preliminary injunction." *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1046 (E.D. Mich. 1994).

The reasons that have been discussed above concerning the third *Jones* factor, as well as the apparent lack of "potential" damages to the Defendants, weigh heavily against requiring the Plaintiff to post a bond in this controversy. On this issue, the Defendants only vaguely refer to "an amount that reflects the damages that may be incurred by [the Defendants] if it is wrongfully enjoined." Furthermore, the Court will not require the Plaintiff to post a bond because to enjoin the Defendants from forwarding written communications to a competitor's business associate under the circumstances of this case would not cause any apparent damage or prejudice to any of the parties in this legal proceeding.

VI.

In summary, the Plaintiff's motion for a preliminary injunction is granted in part and denied in part because all four of the *Jones* factors have been fully satisfied. Contrary to the assertions by the Defendants, the Court concludes - on the basis of the current record in this cause and for the limited purpose of this motion - that the letters to the Arabian United Company and others were designed to adversely affect the Plaintiff's reputation within the float glass industry. Therefore, the Court preliminarily enjoins the Defendants from communicating with any non-parties to this

litigation who have, or may have, an actual or prospective business relationship with the Plaintiff regarding the ownership of the float glass technology during the pendency of this case.[19]

Finally, the Court concludes that an order which will instruct the Defendants to retract their prior mailings is premature and potentially overreaching. Accordingly, the Plaintiff's request for such a directive will be, and is, denied.

IT IS SO ORDERED.

Dated: September 23, 2008                    s/ Julian Abele Cook, Jr.
          Detroit, Michigan                            JULIAN ABELE COOK, JR.
                                                       United States District Court Judge


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 23, 2008.


                                        s/ Kay Alford
                                        Case Manager

---

[19]The Court believes that this preliminary injunction will not limit either of the Defendants from conducting their business activities through the otherwise normal means of traditional competition.