UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL TECHNOLOGIES
CONSULTANTS, INC.,

                    Plaintiff/Counter-Defendant,

v.

LESLIE T. STEWART

                    Defendant,
                                                        Case No. 07-13391
and                                                     Honorable Julian Abele Cook, Jr.

STEWART ENGINEERS &
     ASSOCIATES, INC.,

                    Defendant/Counter-Plaintiff
                    and Third-Party Plaintiff.
v.

DEAN WILEY,

                    Third-Party Defendant.

<u>ORDER</u>

The Plaintiff, International Technologies Consultants, Inc. ("International Consultants"),

is a Michigan corporation which provides consulting services and oversees the construction of float

glass[1] plants throughout the world.  In its complaint, the International Consultants contend that the

Defendants, Stewart Engineers & Associates, Inc. ("Stewart Engineers") and Leslie T. Stewart

---

[1]International Consultants describes float glass as a "[productl that is manufactured
through a procedure commonly known as a 'float process'" which has "considerable cost and
quality advantages over flat glass manufactured through alternative processes (plate glass or
sheet glass)." (International Consultant's motion  at 1).

("Stewart"),[2] have (1) engaged in acts of unfair competition in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), (2) participated in common law unfair competition, (3) intentionally interfered with its contractual relations with other companies, (4) purposefully interfered with a business relationship or expectancy, and (5) libeled it within their trade circles. On September 23, 2008, the Court entered an order which preliminary enjoined Stewart Engineers and Leslie T. Stewart from communicating to any third party with an actual or prospective business relationship with the International Consultants about the ownership of the float glass technology at issue in this case.

Currently pending before the Court are (1) Stewart Engineers' motion for a partial summary judgment relating to the International Consultants' claims, and (2) the International Consultants' motion for a summary judgment on Stewart Engineers' counterclaims.

I.

The essential facts underlying this litigation were carefully summarized in the order of September 30, 2008 by this Court and are reproduced here in relevant part as follows, with additions in {brackets} where necessary for purposes of this order:

> The parties to this litigation, both of whom are business competitors within the float glass industry, submitted bids to the Arabian United Float Glass Company ("Arabian United Company") in separate efforts to secure a work assignment in connection with the development of a float glass plant in Yanbu, Saudi Arabia {referred to in this order as the AUFGC project}. The Arabian United Company

---

[2]Stewart Engineers is a Michigan corporation which provides consulting services related to the design and fabrication of glass-making systems. The International Consultants claim that Stewart Engineers is one of its competitors. Leslie T. Stewart, also a resident of Michigan, is the President, Director, and sole shareholder of Stewart Engineers. For purposes of brevity, this order uses the designation, "Stewart Engineers," to refer to the two Defendants (Stewart Engineers and Leslie T. Stewart) collectively, unless a specific reference to either of these two parties becomes necessary.

ultimately awarded the contract to the team on which the Plaintiff was a member.[3]

On April 4, 2007, the Defendants sent a letter[4] to the Arabian United Company which called into question the reliability of the Plaintiff as a float glass consultant, as well as its ownership of the float glass technology that would be utilized during the Yanbu project.[5] At the same time, the Defendants sent a similar letter to the company that provided the financing for this project.

_____

[3]The project had been originally awarded to {Stein Heurtey}, a {French} company which employs the technology that had been supplied by the Defendants. {The Defendants have proffered evidence that the Arabian United Company issued letters to a potential financier of the project which expressed its intention to work with Stein Heurtey on the Arabian United Float Glass project. In the Defendants' judgment, this letter of intent gave rise to the Defendants having a legitimate business expectancy in making a profit from the Arabian United Float Glass deal.} However. . . the Arabian United Company terminated its agreement with Stein {Heurtey} and, thereafter, entered into a contract with the Shanghai Pony Technologies Company. The Plaintiff had partnered with the Shanghai Pony Technologies Company Ltd. in its bid on the Yanbu project.

[4]The three page letter, which opens with a reference to the Yanbu project and all of the other parties involved, thereafter asserts that:

[The Defendants] have grave concerns about the ownership of the float technology being used in this facility. . . In order to limit your liabilities and ensure the success of this project, you must consider the history of those involved and question the following:

• Who developed and owns the float technology being used?
• Is the design being used complete?
• Can the technology provider demonstrate that the technology originated with them and that the copyrights and intellectual property rights of others have not been infringed?
• Has the float technology provider successfully completed previous projects or have they left the projects prior to completion?
• Is there a history of deception and lawsuits related to previous projects?

The letter then gives a chronicle of the "StewartFloat®" and the Plaintiff's project history. It closes by opining that "only those that are competent and can be trusted, should handle [float glass technology's] implementation."

[5]The Defendants claim, without providing any evidence or explanation in their response to this pending motion, that the Plaintiff "implie[d] that it will be using, the 'StewartFloat®' technology," developed by Stewart Engineers & Associates.

{Similarly, in 2007, the parties were competitors on two different teams bidding for the construction of a float glass plant in Saratov, Russia (the Saratov Project). The contract was ultimately awarded to ITC and its partners, with SEA and its partners (including a company named Belgium Glass Equipment and referred to in the litigation as BGE) being part of the team whose bid was not accepted. As part of this litigation, ITC alleges that SEA, acting through BGE, interfered with its business interests on the Saratov project by issuing a damaging letter similar to the one circulated to officials on the AUFGC project. According to ITC, SEA's alleged misconduct cost ITC approximately $150,000 in contract concessions.}

. . . .

The dispute between the parties regarding the ownership of the float glass technology centers around a nearly two decade old accord between the parties. On June 5, 1989, the Plaintiff and Stewart Engineers & Associates executed a confidentiality agreement in anticipation of working together for an extended period of time. However, the passage of time produced a disagreement among the parties over the scope and purpose of their agreement which reads, in pertinent part, as follows:

> 2. No copies will be made or retained of any written information supplied.
>
> 3. At the conclusion of our discussions, or upon demand by [Stewart Engineers & Associates], all information, including written notes, photographs, memoranda, notes taken by [the Plaintiff] shall be returned to [Stewart Engineers & Associates, Inc.].
>
> 4. This information shall not be disclosed to any employee or consultant unless they agree to execute and be bound by the terms of this agreement.

The Defendants contend that this agreement was drafted in anticipation of their working in close harmony on various float glass manufacturing projects which would allow the Plaintiff to have access to and the use of Stewart Engineers & Associates's trade secrets. It is the Plaintiff's position that this agreement was narrowly tailored to the "U.S. Glass" project - a float glass project which began in 1988 and ended during the following year.[6] In their agreement, the parties also indicated that "the Company has or shall furnish to the undersigned certain confidential information, *as set forth on [the] attached list . . .*" (emphasis added). However, neither party has been able to produce the "list," to which they made reference in the agreement. They also disagree about its relevance to this controversy.

---

[6]"U.S. Glass" is listed in the preamble of the 1989 confidentiality agreement as a party to this agreement.

. . . .

The record indicates that the post-1989 business dealings between these parties consisted of two projects;  namely, (1) float bath design services that pertained to a plant to be built in Europe (the "EuroGlas Project"), and (2) engineering services that related to a plant to be built for an Indonesian corporation, P.T. Muliaglass (the "Muliaglass Project").

The EuroGlas Project

On March 7, 1990, the Plaintiff and Stewart Engineers & Associates signed an agreement relating to the "EuroGlas Project," the pertinent provisions (i.e., those related to royalties and payments, payments to the engineer, and the invention agreement) are as follows:

2.3.1 The Engineer [Stewart Engineers & Associates] engages itself not to violate any rights (patents and royalties, etc.) of third parties in fulfilling this agreement *and to use only public domain information*.  (emphasis added).
. . . .

{8.1 Payments shall be made by the Owner to the Engineer according to the following procedure:

8.1.1 On or before the first day of each month after Work has commenced, the Engineer shall submit to the Owner [the Plaintiff] an Application for Payment in such detail as may be required by the Owner for the period ending on the last day of the previous month.  Each such application shall be for an amount equal to those listed in the following payment schedule and less a retainage of 10%.  Retainage will be held by the Owner and will accumulate interest . . . . The retainage period shall end at the successful start up of the Float Line Tin Bath and shall not exceed ten years after the signing of this Agreement. At the conclusion of the retainage period the Owner will pay the retainage plus the accumulated interest to the Engineer.}

. . . .

8.2 The Engineer warrants and guarantees that title to all work (including sketches, drawings, and computer discs) covered by an application for payment will pass to the Owner . . . upon receipt of such payment by the Engineer free and clear of all liens, claims, security interests or encumbrances.
. . .

INVENTION AGREEMENT

12.1 For good consideration, and in consideration of the Engineer being employed by the Owner; the Engineer hereby agrees, acknowledges and represents:

12.1.1 The Engineer, during the course of this Project, shall promptly disclose in writing to the Owner all inventions, discoveries, improvements and innovations which:

      a.      Result from any work performed on behalf of the Owner, or pursuant to a suggested project by the Owner, or

      b.      Relate in any manner to the existing or contemplated business of the Owner, or

      c.      Result from the use of the Owner's time, material, employees or facilities.

12.1.2 *The Engineer hereby assigns to the Owner, it's successors and assigns, all right, title and interest to said inventions* (emphasis added).

12.1.3 The Engineer shall, at the Owner's request, execute specific assignments to any such invention and execute, acknowledge, and deliver any additional documents required to obtain letters patent in any jurisdiction and shall, at the Owner's request and expense, assist in the defense and prosecution of said letters patent as may be required by the Owner. This provision shall survive termination of the Engineer's employ with the Owner.

Although § 8.2 expressly deals with the transfer of title for design work, it also establishes a prerequisite condition for payment. On this issue, the Plaintiff contends that throughout the EuroGlas Project it made payments to Stewart Engineers & Associates in the amount of $1,069,617.[7] Notwithstanding this assertion, the Defendants submit that the Stewart Engineers & Associates firm was not fully compensated for its work under this agreement.

The Muliaglass Project

---

[7]It is the contention of the Plaintiff that every payment prior to the termination of the EuroGlas Project agreement, with the exception of the retainage, was made. Moreover, the Plaintiff contends that the prerequisite conditions for the retainage were neither met nor was its payment relevant to the transfer of rights. The Plaintiff provided the Court with records which purported to show these payments. On the other hand, the Defendants, without providing any evidence for their assertion, reiterate that (1) they were not fully paid for their work and (2) the Plaintiff does not own the technology it produced.

On August 22, 1990, the parties entered into an agreement which was similar to that used in the EuroGlas Project. The relevant provision regarding the parties' use of intellectual property is the following:

Article 6.    INTELLECTUAL PROPERTY

The parties hereby agree that any *intellectual property in the form of new designs, processes or equipment that may be developed by* [*Stewart Engineers & Associates*] in the course of performing its services pursuant to this Agreement shall become the property of [the Plaintiff]. In this regard, [Stewart Engineers & Associates] agrees to execute any and all documentation necessary to reflect such ownership (emphasis added).

The Defendants maintain that they did not develop "any new designs, processes, agreements, sketches or technology for either of the [two projects]." Thus, in their opinion, there was nothing for them to assign to the Plaintiff under any circumstances. Moreover, they argue that the Plaintiff terminated all of their agreements (with the exception of the confidentiality agreement of 1989), as reflected in a letter of June 6, 1991. The Plaintiff disagrees, countering the Defendants' first assertion by citing to the deposition[8] testimony of Leslie T. Stewart, in which he stated the following:

Q. The design that you created for Indonesia and EuroGlas belongs to [the Plaintiff]; is that right?

A. They purchased the design, yes.

Q. So you are not free to sell that design to somebody else, true?

A. That's correct.

II.

_____

[8]The deposition was taken during a lawsuit brought by Guardian Industries Corporation ("Guardian") against the Plaintiff, the Defendants, and Dean Wiley for having misappropriated its trade secrets. However, the Defendants dispute the context of these statements, arguing that the deposition was given on the assumption that the Plaintiff would "perform its written and oral agreements with Stewart Engineers & Associates to compensate it for services rendered on those projects." Again, the Defendants have not provided the Court with any evidence that the Plaintiff did not fully pay them for their services.

In a four page pleading, Stewart Engineers claims that the International Consultants have failed to present any evidence that would establish a genuine issue of a material fact (i.e., whether it had improperly interfered with its business dealings on the Saratov project). Thus, Stewart Engineers attempts to exclude the Saratov project from the scope of the International Consultants' lawsuit. More specifically, Stewart Engineers contends that the International Consultants have no credible proof that it ever "sent an inappropriate letter to Saratov "while the two companies were competing for business on the Saratov project. (Stewart Engineers' motion for summary judgment at 3).

## A.

According to Federal Rule of Civil Procedure 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." In evaluating such a motion, the Court is obligated to examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

International Consultants oppose Stewart Engineers' motion by noting that circumstantial evidence suggests that the movant had engaged in a hostile letter campaign for the purpose of interfering with its competitor's business opportunity in the Saratov project. International Consultants have presented proof which suggests that Stewart Engineers issued two letters to the

leaders and/or parties which provided financing on the Arabian United Float Glass Project which questioned the International Consultants' intellectual property rights to the float glass technology. International Consultants also furnished a third letter that, although addressed to Belgium Glass Equipment as a Stewart Engineers team member, is similar in substance and form to those letters that had been sent in connection with the Arabian United Float Glass Project. Stewart Engineers acknowledges that it prepared this third letter for use "in encouraging representatives of the Saratov float glass project . . . to investigate and determine the truth about . . . [the International Consultants's] use of float glass technology and its lack of authority to use such technology on the Saratov project." (Stewart Engineers' Reply to the International Consultants' motion for summary judgment at ii). However, Stewart Engineers claims that the International Consultants have no knowledge or admissible evidence which would establish that the Belgium Glass Equipment letter was ever transmitted to a Saratov representative.

After an examination of this record, Stewart Engineers' motion for a summary judgment must be denied. Although the International Consultants have not presented conclusive proof that the Saratov officials received the third letter, they have presented indirect evidence from which a reasonable fact finder could infer that Stewart Engineers - through its partner, Belgium Glass Equipment - used or attempted to use this letter to interface directly with the Saratov decision makers about the legitimacy of the International Consultants' business acumen and trustworthiness. This conclusion is based on (1) evidence that was gleaned from a Belgium Glass Equipment email communication which stressed the importance of including Stewart Engineers on documents that were utilized in its business dealings in Russia, (2) proof that the third letter included Stewart Engineers, (3) statements within the Belgium Glass Equipment email which suggested that it had

planned to meet with Saratov in late July, (4) a July 27, 2007 date on the third letter which was furnished to Belgium Glass Equipment for its use in the Saratov negotiations, (5) an email message (which bore the date of July 27, 2007) from a member of the Saratov project who had requested confirmation of the International Consultants team's rights and/or license to the float bath technology "because Belgium Glass Equipment said [the team doesn't] have it," and (6) a follow-up letter of July 28, 2007 from a member of the International Consultants' team who had responded to the concerns in the July 27th email from the member of the Saratov team. (Exhibit I to International Consultants' Corrected Response in Opposition to Stewart Engineers' motion for partial summary judgment).

Stewart Engineers challenges the International Consultants' view of the record by, in part, urging the Court to consider an affidavit from Leslie T. Stewart who insists that he has no knowledge of the third letter ever having been furnished to a representative on the Saratov project. However, to accept Stewart Engineers' argument would require the Court to resolve a clear factual dispute in its favor, which would be contrary to the Court's role at the summary judgment stage. The question of whether the Stewart Engineers' team ever published its letter to members of the Saratov project involves a genuine factual dispute over a material issue in this litigation. As such, this request for the entry of a summary judgment by Stewart Engineers must be denied.

B.

Although the International Consultants refers to their pleading as a motion for summary judgment, a plain reading of this document clearly indicates that they initially sought to obtain the dismissal of Stewart Engineers' counterclaims under Fed. R. Civ. P. 12(b)(6), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

However, because International Consultants' motion presents matters beyond the pleadings, Rule 12(d) instructs that "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).[9]

(1)    Stewart Engineers' Action for Breach of Contract Against International Consultants and Wiley (Counts I and II)

The first two counts of Stewart Engineers' counterclaim seek to obtain damages for an alleged breach of the 1989 "Confidentiality Agreement Between Firms" that was signed by Leslie T. Stewart and Wiley on behalf of their respective firms.  This agreement obligated Stewart Engineers to share certain confidential information relating to the feasibility, design, construction and operation of a float glass manufacturing facility.[10]  Stewart Engineers posits that the International Consultants and Wiley breached their contractual obligations by disclosing its trade secrets to third parties in their bids on the Arabian United Float Glass Project and the Saratov projects.  (Stewart Engineers' Counterclaim at 14-17).

To prevail on a claim for breach of contract under Michigan law, a plaintiff must first establish that a valid contract exists between the parties.  A valid contract requires "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 187 Mich. App 418, 422 (1991).

---

[9]Stewart Engineers has responded to the International Consultants' pleading as a motion for summary judgment. Thus, any concerns about providing notice to Stewart Engineers that the motion to dismiss will be treated as a motion for a summary judgment appears to have been satisfied.

[10]The International Consultants claim that because the Confidentiality Agreement makes repeated references to "the Company" and "the undersigned" without defining those terms, the document is ambiguous as to which party is the producing party and which party is the receiving party.  (International Consultants' motion for summary judgment at 2).

Mutual agreement or mutual assent refers to a meeting of the minds on all material terms of the contract. *Kamalnath v. Mercy Memorial Hosp Corp*, 194 Mich. App 543, 549 (1992); *See also, Heritage Broadcasting Co. v. Wilson Communications, Inc*., 170 Mich. App. 812, 818 (1988) ( a meeting of the minds "is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind."). Once a contract has been validated, a plaintiff who seeks to recover for its breach must show a violation of the terms of the contract and damages which were caused by its violation. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir.1999).

Here, the International Consultants maintain that the Confidentiality Agreement is not a binding contractual obligation. Furthermore, the International Consultants contend that by referring to - but failing to create - the "attached list" referenced in paragraph four of the Confidentiality Agreement, the parties left open a material term which, in their opinion, rendered the document fatally flawed. To support this argument, the International Consultants cite *Brodsky v. Allen Hayosh Industries, Inc.*, 1 Mich. App. 591, 595 (1965), which observes that "[i]f the document or contract that the parties agree to make [contains] any material term that is not already agreed on, no contract has yet been made."

Stewart Engineers challenges the International Consultants' reliance on the findings in *Brodsky* which relate to a certain type of business contract, i.e. "preliminary agreements for the construction and lease of business premises." *Id.* Stewart Engineers notes that the parties in the case that is now pending in this Court had no such deal as in *Brodsky*, which is commonly referred to as an "agreement to agree." Therefore, in Stewart Engineers' opinion, the lack of specificity about the confidential information does not nullify the agreement.

Adopting Stewart Engineers' theory would require the Court to read *Brodsky* too narrowly. It is true that *Brodsky* was tasked with interpreting an agreement to agree. At its core, however, the reasoning of the court merely echoed the familiar principle that there must be a meeting of the minds on all material terms before a contract will be deemed to be valid and enforceable. *Heritage, supra* at 819 (contract to make subsequent agreement is not per se unenforceable, and it may be just as valid as any other contract as long as it specifies all material and essential terms and leaves none to be agreed upon as the result of future negotiations). Thus, the Court finds that the logic of *Brodsky* also is also applicable to the facts here.

Stewart Engineers concedes that the Confidentiality Agreement never identified the exact nature of the confidential trade secrets that were supposed to be protected from disclosure. (Stewart Engineers' Response to the International Consultants' motion for summary judgment at 8). But, it attempts to neutralize this fact with testimony from Leslie T.Stewart that "[w]hat [he] recall[s] is that the attached list was never created, but it was intended to be created to list possible projects that may have followed [the Confidentiality Agreement]."*Id.; See also,* (Exhibit 4 to the International Consultants' motion for summary judgment at 12). Stewart Engineers also asks the Court to cure any uncertainty in the contract's indefinite terms by looking to the parties' subsequent dealings on the EuroGlas and Muliaglass projects (which occurred nine and fourteen months respectively after the parties executed their Confidentiality Agreement). Yet, looking to those agreements merely shows that the parties promised to maintain confidentiality as to the trade secrets associated with those particular projects.[11] Judging from the express words and visible acts

_____

[11]In particular, the EuroGlas agreement included a clause entitled, "Proprietary Information,"which stated that "[t]he information and/or data in this document may constitute proprietary information of [Stewart [Stewart Engineers]s] and is supplied for use by it's [sic]

of the parties as manifested in the Confidentiality Agreement, it is clear that the companies failed to articulate the most important clause in their contract, i.e., the precise nature and substance of Stewart Engineers' coveted trade secrets. This information goes to the very heart of Stewart Engineers' case. In order to prove that a breach of contract had occurred, Stewart Engineers must show that (1) specific confidential information was protected by the 1989 agreement, and (2) these secrets were divulged in a way that caused it to sustain an injury. Even viewing the record in a light that is most favorable to Stewart Engineers reveals that reasonable minds would collectively agree that the parties had not reached a mutual agreement regarding the confidentiality of any particular Stewart Engineers trade secrets. Thus, the entry of a summary judgment on these grounds is proper. Therefore, the Court declines the International Consultants' invitation to conclude that this lawsuit is barred by the statute of limitations.[12]

Finally, the International Consultants contend that, inasmuch as Dean Wiley was never a party to the Confidentiality Agreement (which is literally titled "Confidentiality Agreement Between Firms"), he should not be held individually liable for Stewart Engineers' breach of contract claim. In the opinion of the International Consultants, Wiley signed the agreement as a

_____

customers. The disclosures contained in this document are made with the understanding that they are confidential and will not be used in any way detrimental to this company's interest." The Muliaglass agreement contained language that more specifically affirmed the Confidentiality Agreement by noting that "[t]he parties have heretofor executed an agreement entitled Confidentiality Agreement Between Firms which was signed by the parties on June 5,1989 and is attached hereto as Exhibit A. The parties agree and wish to reaffirm that the terms and conditions of that agreement are still valid and remain in force throughout the duration of this agreement. Further, the parties intend to add the P.T. Muliaglass Project to the list attached to the original of the aforementioned confidentiality agreement."

[12]The International Consultants make an additional argument that Stewart Engineers' breach of contract claims do not satisfy the modern pleading standards under *Iqbal* and *Twombly*,

representative of the International Consultants, and Stewart Engineers has neither pled nor established any basis for piercing the corporate veil.

Stewart Engineers responds by noting that the parties specifically agreed that the confidential information within their agreement "shall not be disclosed to any employee or consultant unless they agree to execute and be bound by the terms of this agreement." (Confidentiality Agreement at paragraph 4). Inasmuch as Wiley was an International Consultants employee to whom the trade secrets were disclosed, Stewart Engineers contends that he should be held accountable as a Defendant in his individual capacity because of (1) his knowledge of the Confidentiality Agreement, (2) an implicit acceptance to be bound by the terms of his employer's written commitments, and (3) an alleged violation of the parties' contractual obligations.

The only binding authority that has been cited by Stewart Engineers to support this argument is *Hosner v. Brown*, 40 Mich. App. 515, 536-37 (1972), which commented on this principle in a unique case wherein the plaintiff was simultaneously an employee, a board member, and an officer of several companies that were the subject of his shareholder's derivative suit against the corporation. Unlike the case at bar, the question presented in *Hosner* was not whether it was appropriate to pierce the corporate veil and hold the plaintiff personally liable for the alleged misdeeds of the corporation. Rather, the Michigan Court of Appeals was concerned with the propriety of the trial judge's refusal to appoint a receiver for the corporation in a situation where the plaintiff had failed to make the requisite factual showing that such a drastic measure was appropriate. *Id.* at 536. The *Hosner* court did opine, in dicta, that the plaintiff - as an officer, director and employee of the corporation - was "chargeable with the knowledge of those things which he knew, or should have known by diligent inquiry." *Id.* However, the court only made that

reference for the purpose of noting that the plaintiff was in a "difficult" position and that he lacked credibility as to his contention that there was an urgent need for the appointment of a receiver. Contrary to what Stewart Engineers suggests, the *Hosner* court did not conclude that an officer's mere knowledge of the business affairs of his corporation would render him personally liable for acts of misconduct arising out of those affairs. Moreover, such a conclusion is not warranted on the basis of the facts as alleged here. Even if Wiley is charged with personal knowledge about the terms of the Confidentiality Agreement, Stewart Engineers has not presented any evidence which credibly suggests that he agreed - in his personal capacity - to be bound by the terms of this instrument. Since Stewart Engineers has failed to identify any relevant authority to support this claim regarding Wiley's personal liability, the Court must grant his request for the entry of a summary judgment on this issue.

(2)  Stewart Engineers' Counterclaims for Interference with Business Relationship or Expectancy Against International Consultants &  Wiley on the Arabian United Float Glass Project and Saratov projects (Counts III, IV, V and VI)

All of these four counts of Stewart Engineers' Counterclaim arise out of its claims for interference with a business relationship or expectancy.  To prove this claim under Michigan law, a party must establish the following elements:  (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interfering party, (3) an intentional and wrongful interference which induced or caused a breach or a  termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted. *P.T. Today, Inc. v. Commissioner of Office of Financial and Ins. Services*, 270 Mich.

App. 110, 148 (2006).  The first three of these factors will be considered in turn below.[13]

      *(a)*      *Is there a genuine issue of a material fact as to whether Stewart Engineers had a valid business relationship or expectancy on the Arabian United Float Glass Project and Saratov projects?*

      The law in Michigan succinctly states that a plaintiff's expectancy in a business relationship must reflect a reasonable likelihood or a probability that the relationship will result in future economic benefit to the plaintiff - not merely wishful thinking.  *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377 (1984).  The International Consultants contend that, inasmuch as Stewart Engineers only had letters of intent to do business on the Arabian United Float Glass Project and the Saratov projects, they were allowed to compete for the work until a final agreement was signed.  Stewart Engineers challenges this view of industry practice, and, in so doing, submits an opposing declaration from Leslie T. Stewart who asserts that once it becomes known that a letter of intent has been signed, rival bidders terminate their pursuit of that project.

      In view of this competing evidence, it would be inappropriate for the Court to grant International Consultants' request for a summary judgment on the question of whether Stewart Engineers had a reasonable likelihood of establishing a business relationship or expectancy on the Arabian United Float Glass Project and the Saratov projects.

      *(b)*      *Is there a genuine issue of a material fact as to whether International Consultants knew of Stewart Engineers' business relationship or expectancy?*

---

[13]It is true that Stewart Engineers must prove damages arising out of its claims relating to the alleged improper tactics by the International Consultants.  However, neither party expended any time addressing this argument in their summary judgment pleadings.  The International Consultants do little more than identify this element during their recitation of that which Stewart Engineers must prove under the law.  In like fashion, Stewart Engineers devoted virtually no time whatsoever to the damages question in its responsive brief.  In light of the parties' failure to adequately analyze this issue, the Court makes no ruling on this subject.

The International Consultants claim that Stewart Engineers has no evidence that the International Consultants or Wiley knew about the letters of intent regarding the Arabian United Float Glass Project or the Saratov project. Although the International Consultants submitted an affidavit from Wiley to support its position, Stewart Engineers produced an affidavit from Stewart as a counter-measure. Stewart Engineers also proffered a series of emails, all of which were designed to suggest that the International Consultants and Wiley were aware that it was part of a team that sought to obtain the successful bid on the two projects. However, the only reasonable inference to be drawn from these email messages was that the Arabian United Float Glass Company and Saratov were involved in competitive negotiations with both parties over issues such as indemnification, licensing, etc., Thus, even after viewing these proffered emails in a light that is most favorable to Stewart Engineers, the Court cannot find that the International Consultants officials knew or should have known that Stewart Engineers had a valid business expectancy in either of these projects.

However, Stewart Engineers observes that in order to prove this claim, it does not have to prove that the International Consultants was aware of an actual binding contract with a third party. Rather, Stewart Engineers submits that it would be sufficient to show that the International Consultants had knowledge of facts which, if followed by a reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties. In its assessment of the facts regarding the parties' respective positions on this issue, the Court concludes that it would be unreasonable to assign liability to the International Consultants because it continued to compete for the Arabian United Float Glass or the Saratov projects even though they knew, or should have known, that Stewart Engineers was a part of a team that had submitted opposing bids. Without

facts to show that the International Consultants and/or Wiley knew of Stewart Engineers' letters of intent or claimed business relationship or expectancy in either of these two projects, Stewart Engineers cannot establish a genuine issue of a material fact as to this key element. A summary judgment, therefore, must be entered.

     (c)    *Is there a genuine issue of a material fact as to whether International Consultants wrongfully interfered or caused a breach or termination of International Consultants's business relationship or expectancy?*

Stewart Engineers questions the International Consultants' claim that they were seeking legitimate business interests. To sustain this challenge, there must be proof that the International Consultants and Wiley behaved illegally, unethically or fraudulently to support its tortious interference claims. *See generally, Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 12-13 (1992) ("[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and is unjustified in law for the purpose of invading the contractual rights or business relationship of another . . . . A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances") (modification in original; internal citations omitted).

To meet its burden, Stewart Engineers cites the testimony of Wiley who - in his competition for the Arabian United Float Glass project and the Saratov project - admits using the drawings of Leslie T. Stewart which potentially contain trade secrets. Moreover, Stewart Engineers contends that Wiley and the International Consultants lied to Arabian United Float Glass Project when they caused one of their partners to fraudulently claim that "Wiley himself" had made the conceptual drawings which underlaid the Arabian United Float Glass project when "in truth . . . Wiley had no experience in such design work." (Stewart Engineers' Response at 14).

Upon carefully reviewing the evidence, however, it is clear that Stewart Engineers has overstated its position as to both claims. As an initial matter, even Stewart Engineers recognizes that its argument is speculative. It observes that "**If** [Leslie T. Stewart's] drawings contain protectable trade secrets or confidential information, which is to be decided in this case, then International Consultants and Wiley will have competed with Stewart Engineers by 'illegal, unethical or fraudulent' means . . . in violation of the Confidentiality Agreement and/or the Michigan Uniform Trade Secrets Act . . . ." (emphasis added). Moreover, the record does not support Stewart Engineers' claim that Wiley and/or the International Consultants definitively "lied" when he told the members of the Arabian United Float Glass project team that he personally prepared the basic, conceptual float bath design for the project. At best, his deposition testimony suggests that his experience in design work was limited. Yet, even when the Court considers this evidence in a light that is most favorable to Stewart Engineers as the non-moving party, the record does not permit a reasonable fact finder to conclude that the International Consultants acted fraudulently or unfairly competed in a manner that invaded its contractual rights or business expectancy. Furthermore, Stewart Engineers has not presented any evidence or an argument from which a reasonable fact finder could decide that the International Consultants' alleged wrongful conduct induced or caused a breach or termination of its relationship or expectancy.

Thus, because Stewart Engineers cannot carry its burden on at least two requisite elements of its related claims for an interference with a business relationship or expectancy, the International Consultants' motion for a summary judgment must be granted in its entirety.

(3)     Stewart Engineers' Counterclaims for violation of Michigan's Uniform Trade Secrets Act Against The International Consultants and Wiley (Counts VII and VIII)

To prove a cause of action for a violation of the Michigan Uniform Trade Secrets Act,

Stewart Engineers must show that (1) it has protectable trade secrets, and (2) the International Consultants and/or Wiley had improperly acquired, disclosed or used those trade secrets. *See Compuware Corp. v. International Business Machines Corp*., No. 02-70906, 2003 WL 23212863, *6 (E.D.Mich. Dec. 19, 2003); Mich, Comp. Laws § 445.1902. A court can (1) enjoin an actual or a threatened misappropriation of a trade secret and (2) compel those affirmative acts that are necessary to protect a trade secret. *CMI Intern., Inc. v. Intermet Intern. Corp.,* 251 Mich. App. 125, 132 (2002). Misappropriation includes the disclosure or the use of a trade secret without consent. Mich. Comp. Laws § 445.1902(b)(ii).

Moreover, in order to qualify as a trade secret under the Michigan Uniform Trade Secrets Act, the information must separately (1) "derive[ ] independent economic value . . . from not being generally known" and (2) be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Compuware Corp.* at *6. Information may be "generally known" if it has been disclosed to, is known to, or is ascertainable by persons in the relevant industry or field. *Id.*

Finally, a party that alleges trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity. *Id.* In its responsive brief, Stewart Engineers does not identify the precise nature of its alleged trade secrets, and this - standing alone - ultimately proves fatal to its Michigan Uniform Trade Secrets Act claim. However, this order will address the International Consultants' remaining arguments in support of their motion for summary judgment on this aspect of Stewart Engineers' counterclaim.

The International Consultants point to the admission by Stewart Engineers that the Muliaglass design was not a trade secret, but rather it was information within the public domain. (International Consultants' motion at 18). Stewart Engineers perceives this claim by the

International Consultants as an attempt to assert judicial estoppel, and, thereafter, spends a significant portion of its brief in an effort to refute this claim.[14]  Without addressing the estoppel question because it was not the main thrust of the International Consultants' argument - the parties' prior testimony and/or positions are not relevant to the Court's summary judgment analysis.  Their beliefs about whether Stewart Engineers' work did or did not amount to a trade secret does nothing to resolve the question of whether this Company has a legally enforceable claim.

The International Consultants respond by noting that if Stewart Engineers truly owns any trade secrets, these rights have been assigned as a part of the EuroGlas agreement. This position by the International Consultants is supported by a plain reading of the EuroGlas contract, which makes it clear that the issue of ownership of the intellectual property rights is separate from the issue of the ten percent retainage under the Confidential Agreement.  In pertinent part, §8.2 provides that "[t]he [Stewart Engineers] warrants and guarantees that title to all work (including sketches, drawings, and computer discs) covered by an Application for Payment will pass to the Owner *upon receipt of such payment by the [Stewart Engineers]* free and clear of all liens, claims, security interests or encumbrances." (Emphasis added).  Moreover, the International Consultants have presented evidence which suggests that every Application for Payment submitted by Stewart Engineers under §8.1.1 of the EuroGlas contract was fully paid.  Indeed, the records presented by Stewart Engineers in opposition to the International Consultants' motion buttress this finding. Under the terms of the EuroGlas agreement, these payments would have triggered a transfer of title from Stewart Engineers to the International Consultants on all work covered by those payments,

---

[14]Notably, Stewart Engineers assert that the International Consultants also took an inconsistent position in the earlier lawsuit by claiming that these designs were trade secrets.

pursuant to § 8.2. Although the parties disagree about whether the International Consultants fully paid Stewart Engineers the retainage amounts due under the EuroGlas contract, or whether it properly withheld a $45,000 payment because certain contractual conditions were never met, it is clear to this Court that the retainage fee provisions were independent from the clause relating to ownership. Accordingly, the Court finds that the entry of a summary judgment in the International Consultants' favor is warranted on this issue. Thus, the Court declines to address the International Consultants' alternate argument that Stewart Engineers' claims are under Michigan Uniform Trade Secrets Act are time barred as a matter of law.

III.

Therefore, and for the reasons stated above, the Court denies Stewart Engineers' motion for a partial summary judgment in its entirety. Moreover, the Court grants the International Consultants' motion for a summary judgment on Stewart Engineers' counterclaims in its entirety. Specifically, the Court (1) grants the International Consultants' motion for summary judgment arising out of Stewart Engineers' Counterclaims for breach of contract against the International Consultants and Wiley (Counts I and II), (2) grants the International Consultants' motion for summary judgment arising out of Stewart Engineers' Counterclaims for tortious interference with business relationship or expectancy (Counts III, IV, V and VI), and (3) grants the International Consultants' motion for a summary judgment arising out of Stewart Engineers' Counterclaims for violations of the Michigan Uniform Trade Secrets Act (Counts VII and VIII).

IT IS SO ORDERED

Dated: September 22, 2010                         s/Julian Abele Cook, Jr.
          Detroit, Michigan                                  JULIAN ABELE COOK, JR
                                                             United States District Court Judge.

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 22, 2010.

s/ Kay Doaks
Case Manager